# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

CLOUD BYTE LLC,

                 *Plaintiff*,

    v.

DELL INC., and DELL TECHNOLOGIES, INC.,

                 *Defendants*.

Civil Action No. 2:24-cv-00637-JRG

## CLOUD BYTE LLC'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     LEGAL STANDARD.............................................................................................1

III.    PERSON OF ORDINARY SKILL IN THE ART.............................................2

IV.     THE '544 PATENT ...............................................................................................2

        A.      "means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module" (claim 1) ................................................................................2

        B.      "backup storage device" (claims 1, 13) .................................................9

V.      THE '632 PATENT ...............................................................................................12

        A.      "determine that an abnormality is occurring" (claim 1) ........................12

VI.     THE '265 PATENT ...............................................................................................17

        A.      "close to the front face" (claim 1)...........................................................17

VII.    THE '320 PATENT ...............................................................................................21

        A.      "a declination index value calculation unit" (claim 1)............................21

VIII.   THE '273 PATENT ...............................................................................................24

        A.      "standby system" (claims 1, 8, 18, 19) .................................................24

        B.      "the standby system, responsive to the instructions, in case of performing the scale-down" (claim 18) ..................................................................28

IX.     CONCLUSION....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Advanced Coding Techs. LLC v. LG Elecs. Inc.*,
  No. 2:22-cv-00501-JRG, 2024 WL 3794780 (E.D. Tex. July 21, 2024)...................................6

*Alexam, Inc. v. Best Buy Co.*,
  No. 2:10-cv-93, 2012 WL 1188406 (E.D. Tex. Apr. 9, 2012) ...............................................15

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)............................................................................................6

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001)............................................................................................5

*CDN Innovations, LLC v. Grande Commc'ns Networks, LLC*,
  No. 4:20-cv-00653-SDJ, 2021 WL 3615908 (E.D. Tex. Aug. 13, 2021)..............................29

*Cont'l Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019)........................................................................................8, 12

*Deere & Co. v. Bush Hog*,
  703 F.3d 1349 (Fed. Cir. 2012)..........................................................................................19

*Finalrod IP, LLC v. Endurance Lift Sols., Inc.*,
  No. 2:20-cv-00189-JRG-RSP, 2021 WL 2187980 (E.D. Tex. May 28, 2021) .....10, 14, 23, 27

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014)............................................................................................1

*Golden Bridge Tech., Inc. v. Apple Inc.*,
  758 F.3d 1362 (Fed. Cir. 2014)............................................................................................1

*HC Robotics v. Int'l Trade Comm'n*,
  No. 2024-1193, 2025 WL 2424283 (Fed. Cir. Aug. 22, 2025) ..............................................23

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004)..........................................................................................16

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801, 810 (Fed. Cir. 2021) ......................................................................................6

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  327 F.3d 1364 (Fed. Cir. 2003)..........................................................................................16

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999)................................................................7

*Lochner Techs., LLC v. Hewlett-Packard Co.*,
No. 2:09-cv-00177-CE, 2010 WL 4179200 (E.D. Tex. Oct. 20, 2010) ................................23

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364, 1372 (Fed. Cir. 2005)................................................................6, 7

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
194 F.3d 1250 (Fed. Cir. 1999)................................................................5

*PACT XPP Techs., AG v. Xilinx, Inc.*,
No. 2:07cv-00563-CE, 2011 WL 2469909 (E.D. Tex. June 17, 2011) ................................23

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
35 F.4th 1367 (Fed. Cir. 2022) ................................................................2, 28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................1

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396, 1410 (Fed. Cir. 2004) ................................................................6

*Promptu Sys. Corp. v. Comcast Corp.*,
92 F.4th 1372 (Fed. Cir. 2024) ................................................................11, 15

*ProStrakan, Inc. v. Actavis Labs. UT, Inc.*,
No. 2:16-cv-00044-RWS, 2018 WL 11363829 (E.D. Tex. Sept. 28, 2018),
*aff'd*, 787 F. App'x 757 (Fed. Cir. 2019)................................................................16

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)................................................................1, 2

*R2 Sols. LLC v. Deezer S.A.*,
No. 4:21-cv-00091, 2022 WL 36240 (E.D. Tex. Jan. 4, 2022) ................................29

*Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*,
No. 2:19-cv-00225-JRG, 2020 WL 2517581 (E.D. Tex. May 15, 2020)................................17

*Semcon IP Inc. v. Louis Vuitton N. Am., Inc.*,
No. 2:19-cv-00122-JRG, 2020 WL 2544774 (E.D. Tex. May 19, 2020)........................27, 28

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)................................................................19, 20, 21

*SpaceTime3D, Inc. v. Samsung Elecs. Co.*,
No. 2:19-cv-00372-JRG, 2020 WL 7183538 (E.D. Tex. Dec. 7, 2020)................................15

*In re Taasera Licensing LLC, Pat. Litig.*,
   No. 2:22-MD-03042-JRG, 2023 WL 8628323 (E.D. Tex. Dec. 13, 2023) .............................28

*Thomas Swan & Co. Ltd. v. Finisar Corp.*,
   No. 2:13-cv-00178-JRG, 2014 WL 2885296 (E.D. Tex. June 25, 2014) ...............................27

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012).................................................................................1, 27, 28

*TomTom, Inc. v. Adolph*,
   790 F.3d 1315 (Fed. Cir. 2015)...............................................................................11, 12

*Uniloc 2017 LLC v. Google LLC*,
   No. 2:18-cv-00492-JRG-RSP, 2020 WL 569858 (E.D. Tex. Feb. 5, 2020)...........................15

## Statutes

35 U.S.C. § 112, ¶ 6 ...................................................................................................3, 6

## <u>NOTES ON CITATIONS</u>

- **Abbreviations:**

    o   Plaintiff Cloud Byte LLC is referred to herein as "Cloud Byte."

    o   Defendants Dell Inc. and Dell Technologies, Inc. are referred to herein as "Dell."

    o   U.S. Patent No. 7,739,544 is referred to herein as "the '544 Patent." The '544 Patent can be found at Exhibit B to the Declaration of Jonathan Tse, filed with Cloud Byte's Opening Brief.

    o   U.S. Patent No. 9,482,632 is referred to herein as "the '632 Patent." The '632 Patent can be found at Exhibit C to the Declaration of Jonathan Tse, filed with Cloud Byte's Opening Brief.

    o   U.S. Patent No. 9,629,265 is referred to herein as "the '265 Patent."  The '265 Patent can be found at Exhibit D to the Declaration of Jonathan Tse, filed with Cloud Byte's Opening Brief.

    o   U.S. Patent No. 9,651,320 is referred to herein as "the '320 Patent." The '320 Patent can be found at Exhibit H to the Declaration of Jonathan Tse, filed with Cloud Byte's Opening Brief.

    o   U.S. Patent No. 10,628,273 is referred to herein as "the '273 Patent." The '273 Patent can be found at Exhibit J to the Declaration of Jonathan Tse, filed with Cloud Byte's Opening Brief.

    o   A person of ordinary skill in the art is referred to herein as a "POSITA."

    o   The Declaration of Dr. Paul S. Min Regarding the Construction of Disputed Claim Terms from U.S. Patent No. 9,629,265, dated July 25, 2025, filed with Cloud Byte's Opening Claim Construction Brief is referred to herein as "Min Decl." and can be found at Exhibit A.

    o   The Declaration of Dr. William R. Michalson Concerning Claim Construction of U.S. Patent No. 9,629,265, dated July 25, 2025, is referred to herein as "Michalson Decl." and can be found at Exhibit F.

## I.    INTRODUCTION

Cloud Byte's proposed claim constructions are based on the plain and ordinary meaning as understood by one of ordinary skill in the art in light of the intrinsic and extrinsic evidence, or correct a minor typographical error. In contrast, Dell's proposed constructions manufacture words appearing nowhere in the specification, import arbitrary limitations lacking any support in the intrinsic record, and advance interpretations that would exclude disclosed embodiments. Most tellingly, Dell's own positions in parallel IPR proceedings contradict several of its proposed constructions here—revealing that Dell seeks different claim meanings for invalidity and non-infringement. The Court should resolve these claim construction disputes by adopting Cloud Byte's proposed constructions.

## II.    LEGAL STANDARD

The words in patent claims "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (cleaned up). A term's context in the asserted claim can be instructive. *Id.* at 1314. And "claims must be read in view of the specification, of which they are a part." *Id.* at 1314–15.

Only two narrow exceptions permit departure from plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Lexicography requires the patentee to "clearly set forth a definition of the disputed claim term" and "clearly express an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Disavowal of claim scope must be equally explicit: "clear and unmistakable." *Purdue Pharma L.P.*

*v. Endo Pharms. Inc.,* 438 F.3d 1123, 1136 (Fed. Cir. 2006).

Courts may also correct "obvious minor typographical and clerical errors in patents" when "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022).

## III.     PERSON OF ORDINARY SKILL IN THE ART

A POSITA for the '544, '632, '265, '320, and '273 Patents would have possessed at least a bachelor's degree in computer science, electrical engineering, or a related field, with at least two years of experience in the field of computer or server design and development or network communications.

## IV.     THE '544 PATENT

The '544 Patent addresses a critical problem in redundant disk array systems: the severe performance degradation that occurs during disk rebuilding after failure. Ex. B ('544 Patent), Abstract. The inventors recognized that existing systems suffered from "degraded" access performance and "reduced" redundancy during rebuild operations. *Id.* at 1:35–46, 2:22–23. The '544 Patent discloses that an object of the invention is to improve access performance and achieve a higher speed operation for rebuilding of a replacement disk. *Id.* at 2:26–34. To achieve these improvements, the '544 Patent teaches: (1) backing up data from a disk array onto a backup storage device; and (2) when a drive in the array fails, rebuilding data onto a replacement disk drive from the backed-up data in the backup storage device while also simultaneously providing access to disk drives that have not failed. *Id.* at 2:44–52.

> **A. "means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing**

**normal read/write access to the disk drives that have not failed through the RAID module" (claim 1)**

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| Governed by 35 U.S.C. § 112, ¶ 6 | Governed by 35 U.S.C. § 112, ¶ 6 |
| **Function**: rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module | **Function**: rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module |
| **Structure**: disk access bus/switch 18 as described in 3:33-42, 4:29-52, 5:10-32, and 9:9-19 and equivalents thereof | **Structure**: rebuild module 17 following the algorithm disclosed in steps S44, S45, and S46 of Fig. 5, along with disk access bus/switch 18 (and equivalents thereof) |

The parties agree on the function but dispute the corresponding structure for this § 112, ¶ 6 term. Cloud Byte's structure flows directly from the specification, while Dell's structure contradicts the specification and improperly imports extraneous limitations.

The specification clearly identifies the structure that performs the agreed-upon function: "[i]n the present invention, a ***disk access bus/switch*** for data transfer between said backup storage device and said replacement disk drive is provided and the rebuilding of said replacement disk drive from said backup storage is performed through the rebuild module provided in parallel with a RAID module for performing a normal read/write access to said disk array and said ***disk access bus/switch***, thereby said rebuilding operation of said replacement disk drive being prohibited from influencing a normal access by said RAID module . . . to said disk array."[1] Ex. B ('544 Patent) at 3:33–39. Figure 1 crystallizes this teaching:

---

[1]  All emphases are added unless otherwise noted.



*Id.*, Fig. 1 (annotated). The invention provides a structure—**disk access bus/switch 18**—for rebuilding data on the replacement disk drive from the backup storage device through the **rebuild module 17** while simultaneously providing normal read/write access to the **disk drives 11** that have not failed through the **RAID module 13**. The '544 Patent further discloses that the purpose of such a structure is to ensure that the two recited, agreed-upon functions—(1) "rebuilding data on the replacement disk drive from the backup storage device through the rebuild module"; and (2) "providing normal read/write access to the disk drives that have not failed through the RAID module"—can ***both*** occur "non-blocked." *Id.* at 9:10–52. The specification also expressly discloses the disk access bus/switch performing the parties' agreed-upon function:

> In the present invention, ***a disk access bus/switch*** for data transfer between said backup storage device and said replacement disk drive is provided and the rebuilding of said replacement disk drive from said backup storage is performed through the rebuild module provided ***in parallel*** with a RAID module for performing a normal read/write access to said disk array and said disk access bus/switch, thereby said rebuilding operation of said replacement disk drive being

4

prohibited from influencing a normal access by said RAID module…to said disk array.

*Id.* at 3:33–42; *see also id.* at 5:10–32, 9:9–19. The specification also expressly discloses at least four exemplary structures of the disk access bus/switch 18 for achieving the recited function: (1) a "cross bus switch"; (2) a "fibre channel fabric switch"; (3) a "dual Fibre channel arbitrated loop"; and (4) "different access buses." *Id.* at 9:9–19 ("A fibre channel fabric switch or a cross bus switch may be employed as the disk access bus/switch 18 in FIG. 1. . . . Alternatively, a dual Fibre channel arbitrated loop may be used as the disk access bus/switch 18 in FIG. 1."), 5:25–30 ("Alternatively, different access buses constituting the disk access bus/switch 18 may be provided for the RAID module 13 and the rebuild module 17, respectively.").

The Federal Circuit has found similar disclosures of corresponding structures in the specification to be sufficient. *See, e.g.*, *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1381-82 (Fed. Cir. 2001) (finding that a reference in the specification to a commercially available vacuum sensor sufficiently disclosed the corresponding structure capable of performing the recited function); *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("A means-plus-function claim encompasses ***all*** structure in the specification corresponding to that element and equivalent structures. . . . [T]he district court erroneously overlooked alternative embodiments of the invention.").

Dell's proposed structure fails for multiple independent reasons:

***First***, Dell improperly includes the rebuild module as part of the corresponding structure—*i.e.*, "rebuild module 17 following the algorithm disclosed in steps S44, S45, and S46 of Fig. 5"—which is involved with, but not the crux of, the recited functionality for "simultaneously providing" both the "rebuilding data on the replacement disk drive from the backup storage device through

5

the rebuild module" and the "normal read/write access to the disk drives that have not failed through the RAID module." Ex. B ('544 Patent) at 9:48–52; *see also id.* at 3:35–39, 1:36–40.

**Second**, Dell's injection of "the algorithm disclosed in steps **S44, S45, and S46** of Fig. 5" violates black-letter claim construction law. The corresponding structure in both parties' proposals already includes a "disk access bus/switch," which is ***not*** a general-purpose processor or general-purpose computer programmed to carry out any algorithm. Dell's attempt to inject such an algorithm into the construction is improper as a matter of law. *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[I]n a means-plus-function claim ***in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm***, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.") (quotations omitted); *Advanced Coding Techs. LLC v. LG Elecs. Inc.*, No. 2:22-cv-00501-JRG, 2024 WL 3794780, at *5 (E.D. Tex. July 21, 2024) ("***For § 112, ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor***, the corresponding structure described in the patent specification must usually include an algorithm for performing the function.").

**Third**, the rebuild module already appears as a **separate** limitation in claim 1 ("a rebuild module for performing rebuilding…"). Including it again in the means-plus-function structure would render that separate limitation superfluous and redundant. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("interpretations that render some portion of the claim language superfluous are disfavored"); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed.

Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.") (citations omitted).

*Fourth*, Dell's reliance on step S46 would also improperly import a "modify map" limitation that appears only in dependent claims, not in independent claim 1. *See, e.g.*, Ex. B ('544 Patent), claims 2–3, 5–8, 15–19. Since "different words or phrases used in separate claims are **presumed** to indicate that the claims have **different** meanings and scope," it would violate Federal Circuit law to inject the "modify map" limitation from the dependent claims into independent claim 1, as Dell seeks to do here by invoking S46 in its construction. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999) (under the doctrine of claim differentiation, "limitations stated in dependent claims are not to be read into the independent claim from which they depend"). In *Karlin*, the Federal Circuit reversed a district court's overly restrictive construction of the phrase "series of threads" recited in an independent claim, in part because certain claims that had been included in the original application as dependent on that same independent claim recited "additional structure related to the threads," and thus the doctrine of claim differentiation supported a "broad construction" of the term. *Id.* So too here—the dependent claims recite "additional structure" (*i.e.*, the "modify map" as recited in S46) related to the rebuild module, and thus the doctrine of claim differentiation supports a "broad construction" that does not require S46.

*Fifth*, Figure 5, which contains steps **S44, S45, and S46** recited in Dell's proposed structure, describes an exemplary flow diagram for "processing before and after a crash":



Ex. B ('544 Patent), Fig. 5; *see also id.* at 4:11–12. Here, S46 relates to a "modify map to generate data and write the data to new HDD." *Id.*, Fig. 5. But **nowhere** in the specification does it **require** the step of "use modify map to generate data and write the data to new HDD," as recited in S46 be performed in order to achieve the parties agreed upon function for this term. *Id.* Indeed, the specification uses **permissive**, rather than mandatory, language when discussing the modify map. *See, e.g.*, *id.* at 3:4–7, 3:20–23. Such use of permissive language is non-limiting and insufficient to support a disclaimer or disavowal. *See, e.g.*, *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) ("[P]hrases such as 'one technique,' 'can be carried out,' and 'a way' indicate that using Probelec XB 7081 is only one method for making the invention and does not automatically lead to finding a clear disavowal of claim scope").

Accordingly, only Cloud Byte's proposed construction for this means-plus-function term is consistent with the intrinsic evidence and should be adopted.

### B.  "backup storage device" (claims 1, 13)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "device that stores a secondary copy of data from one or more primary RAID devices" |

This term requires no construction. Every POSITA understands what a "backup storage device" means. Dell attempts to inject two qualifiers—(1) "a device that stores *a secondary copy of data*" and (2) "*from one or more primary RAID devices*"—that appear nowhere in the patent. The Court should decline Dell's invitation to add these unsupported limitations and instead accord this term its plain and ordinary meaning.

The '544 Patent discloses that the "backup storage device" stores the "backed-up data" that is used to rebuild data on a replacement disk drive when a disk drive fails. Ex. B ('544 Patent) at 2:38–41, 2:44–52. For example, Figure 1 of the '544 Patent discloses that the **backup storage device 30** stores the backed-up data from the disk array:



*Id.*, Fig. 1; *see also id.* at 4:53–55 ("In the present invention, the backup module 15 periodically backs up data in the disks $11_1$ to $11_n$ constituting the disk array 55 onto the backup storage 30."). Whenever the access module 14 receives a command from host 20 to back up the data, "the backup module 15 reads data from one of the disk drives $11_1$ to $11_n$ through the RAID module 13 (and error detection and correction processing including a parity check and the like is performed) and

writes read data in the backup storage 30." *Id.* at 4:55–60. A POSITA readily understands the plain and ordinary meaning of "backup storage device" and no construction is necessary.

In contrast, Dell's proposed construction is fundamentally flawed for several reasons:

***First***, the construction directly contradicts the specification's teachings. The specification explicitly states: "The backup storage 30 may be ***of course*** configured to ***be*** the disk array." *Id.* at 4:48–49. Under Dell's construction, the backup storage would store a "secondary copy" of data from "primary RAID devices"—even when the backup storage is the RAID array itself. This logical impossibility reveals the fundamental flaw in Dell's approach.

***Second***, Dell manufactures the terms "secondary," "copy," and "primary" from whole cloth. These words appear nowhere in the specification or claims. *Finalrod IP, LLC v. Endurance Lift Sols., Inc.*, No. 2:20-cv-00189-JRG-RSP, 2021 WL 2187980, at *8 (E.D. Tex. May 28, 2021) (rejecting importation of words not appearing in specification because "it would create uncertainty as to the scope of the asserted claims"). Dell injects these terms in its proposed construction to create an improper, artificial distinction between the backup storage device and the devices constituting the RAID array.

***Third***, the impropriety of Dell's proposal is demonstrated by the claims themselves. Claims 1 and 13 only require that the "backup storage device" allow data to be written onto it by a backup module and that rebuilding of data on the replacement disk drive be based on data on the backup storage device. Ex. B ('544 Patent), claims 1, 13. Those claims do not require that the backup storage device always be separate from the disks constituting the RAID array. Nor do claims 1 and 13 ever mention that the backup storage device only stores a "secondary copy" of data from "one or more primary RAID devices," as Dell's proposed construction requires. These arbitrary restrictions would only add "uncertainty" to the claims, which the Federal Circuit cautions against.

*Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("Importantly, a claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term.").

**Fourth**, the Federal Circuit has previously construed a similar term–"storage device"–and held that it should be given its plain and ordinary meaning. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328–29 (Fed. Cir. 2015). There, the district court had construed: (1) "storing section data in the storage device" to mean "storing section data in a separate storage device than the traveled distance data"; and (2) "storing the section file data in the storage device" to mean "storing the section data file in a separate storage device than the traveled distance data and section data." *Id.* at 1328. But the Federal Circuit held both constructions were erroneous. *Id.* Specifically, upon finding that "the specification discloses the different data types can be stored in the **same** storage device," the Federal Circuit reversed the district court, finding that the district court's "reli[ance] **on an embodiment** described in [the patent's] specification" to find that "each type of data identified in claim 1 must be stored in a **different** storage device" was reversible error. *Id.* at 1328–29. Thus, the Federal Circuit held that "these terms should be construed to reflect their plain and ordinary meaning: 'storage device' means 'storage device.'" *Id.* at 1329.

**Finally**, Dell cannot show that the applicant disclaimed, disavowed, or limited the scope of the claimed "backup storage device." Putting aside that nothing in the specification ever mentions the terms "primary," "secondary" or "copy," there are also no clear statements in the intrinsic evidence that suggest that the applicant was attempting to give up claim scope. Indeed, the '544 Patent expressly states that "[t]he present invention is **not limited** to the configuration of the embodiment described above, and may of course include various variations and modifications that could be made by those skilled in art within the scope of the present invention." Ex. B ('544

11

Patent) at 9:21–25. Since Dell cannot show any "expression[] of manifest exclusion or restriction, representing a clear disavowal of claim scope," Dell's proposed construction is unsupported and improper. *Cont'l Circuits*, 915 F.3d at 797 (quotations omitted).

Accordingly, just as in *TomTom*, the Court should afford the term "backup storage device" its plain and ordinary meaning and decline to construe it.

## V.    THE '632 PATENT

The '632 Patent is directed toward detecting abnormalities in the Information and Communication Technology ("ICT") equipment. Ex. C ('632 Patent), Abstract, claim 1, 1:12–17. The '632 Patent discloses "accurately detect[ing] an abnormality of a cooling function, such as clogging of a filter," especially "where the operational status of ICT equipment is not constant." *Id.* at 2:6–11, 4:39–44 (describing operational status as CPU load or power consumption). Indeed, "whe[n] the operational status of the ICT equipment is not constant, it may be impossible to detect an abnormality such as clogging or, by contrast, it may be determined that an abnormality such as clogging is occurring in spite of no abnormality" of the CPU temperature. *Id.* at 1:55–64. To solve this problem, the '632 Patent describes estimating a "possible range of exhaust-air temperatures" and a "possible range of component temperatures [] of the CPU," based on the detection results of the intake-air temperature sensor and CPU load detecting unit. *Id.* at 4:59–5:6. Should the detected CPU temperature be beyond the estimated CPU temperature range based on the identified inputs above, "the determining unit [] determines that an abnormality of the cooling function such as clogging of the filter is occurring." *Id.* at 6:1–15.

### A.  "determine that an abnormality is occurring" (claim 1)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "determine that a deviation from expected or acceptable system behavior is occurring" |

This term needs no construction—its meaning is clear to any POSITA. Dell's proposal to

replace "abnormality" with "deviation from expected or acceptable system behavior" injects ambiguity where none exists and is inconsistent with the specification.

The specification consistently discloses detecting "an abnormality *of a cooling function*," providing concrete examples like "clogging of the filter" and component temperatures exceeding "the upper limit." Ex. C ('632 Patent) at 2:6–11 ("[A]n object of the present invention is to provide an abnormality detection device that solves a problem such that it is impossible to accurately detect *an abnormality of a cooling function, such as clogging of a filter*…."), 5:14–21 ("The determining unit…determine[s] whether an *abnormality of a cooling function such as clogging of the filter is occurring*"), 6:9-15 ("*When the component temperature of the CPU 13 is beyond the upper limit* of the CPU temperature range…the determining unit 164 determines that *an abnormality of the cooling function such as clogging of the filter is occurring*, and drives the alarming unit"); *see also id.* at 6:51–56, 7:3–6, 7:21–25, 7:61–64. Figure 4 of the '632 Patent provides an exemplary flow diagram for detecting an abnormality and crystallizes the importance of accurately detecting abnormalities:



*Id.*, Fig. 4 (annotated). Critically, when no cooling abnormality is detected at step **S46** based on established CPU component and exhaust air temperature limits, the flow proceeds to step **S48** to decrease fan rotation because "the internal temperature of the ICT equipment 1 ***will not excessively rise***" even with reduced cooling. *Id.* at 6:16–29. Under Dell's construction, this scenario—where the system may reduce cooling when no "abnormality" is detected—walks right into same problem the invention is directed at resolving, *i.e.*, where no "deviation from expected or acceptable system behavior" may be detected even though an abnormality with the cooling function is occurring. Reducing rotation of the fans when there is a clogged air filter could be catastrophic.

Dell's proposed construction suffers from other fatal defects as well:

***First***, the term "abnormality" is well understood by a POSITA and there is no ambiguity or any other cognizable reason to replace it with "a deviation from expected or acceptable system behavior," which is absent from the specification. *Finalrod*, 2021 WL 2187980, at *8 ("[T]he

14

Court is not persuaded that it should import words into the claims that do not appear in the specification of the [asserted patent], because it would create uncertainty as to the scope of the asserted claims.").

*Second*, Dell's proposal injects uncertainty and subjectivity as to what is "expected or acceptable system behavior" and a "deviation" thereof. *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) (A construction "should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term."); *Uniloc 2017 LLC v. Google LLC*, No. 2:18-cv-00492-JRG-RSP, 2020 WL 569858, at *8 (E.D. Tex. Feb. 5, 2020) (adopting proposed construction of plain and ordinary meaning where "Defendant's construction instead introduces ambiguity into the claims…because it introduces an unwarranted requirement into the claims"); *SpaceTime3D, Inc. v. Samsung Elecs. Co.*, No. 2:19-cv-00372-JRG, 2020 WL 7183538, at *12 (E.D. Tex. Dec. 7, 2020) (citing *Alexam, Inc. v. Best Buy Co.*, No. 2:10-cv-00093, 2012 WL 1188406, at *6 (E.D. Tex. Apr. 9, 2012) ("[W]here additional language may be…confusing[,] it is in a court's power to determine that no construction is necessary.")). Dell's construction forces a factfinder to guess what "system behavior" would be "expected or acceptable" even "where the operational status of ICT equipment is not constant." Ex. C ('632 Patent) at 2:6-11. Indeed, the specification does not disclose what would be considered a "deviation" of such behavior and the extent to which that is different from the "abnormality of a cooling function" that is consistently disclosed in the specification.

*Third*, replacing "an abnormality" with "a deviation from expected or acceptable system behavior" would read out abnormalities with a cooling function that are not "a deviation from expected or acceptable system behavior." For example, a computer system may be operating normally even though it is not being sufficiently cooled. Importantly, Dell's proposed construction

15

would exclude an "exemplary embodiment" described in the specification to detect "when an abnormality such as clogging of the filter occurs" even when "the load on the CPU 13 is small and the component temperature of the CPU 13 and the exhaust-air temperature are low." *Id.* at 7:21–25. Under Dell's construction, a system where the CPU load is small and component and exhaust air temperatures are low would fall within expected or acceptable system behavior and would not be considered a deviation even though an abnormality of a cooling function is occurring, such as the component temperature exceeding the estimated upper limit. "[C]onstruing a claim to exclude a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support,'" which does not exist here. *See, e.g.*, *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003).

**Fourth**, Dell cannot show that the applicant disclaimed or disavowed, much less clearly, the full scope of this term. *See, e.g.*, *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."). There is nothing in the intrinsic evidence that clearly requires that the abnormality itself **must** be a deviation from expected or acceptable "system behavior."

**Finally**, Dell's contradictory positions expose the weakness of its construction. In the co-pending IPR, Dell relies on the plain and ordinary meaning of this term for purposes of invalidity. Ex. L ('632 IPR Petition) at 10–15, 46–50, 72–73. The patent claim is not a "nose of wax" that may be twisted one way for invalidity and another way for non-infringement. *ProStrakan, Inc. v. Actavis Labs. UT, Inc.*, No. 2:16-cv-00044-RWS, 2018 WL 11363829, at *65 (E.D. Tex. Sept. 28, 2018), *aff'd*, 787 F. App'x 757 (Fed. Cir. 2019) ("This Court and the Federal Circuit have emphasized the importance of consistency for claims to 'be interpreted and given the same

16

meaning for purposes of both validity and infringement analyses.'"); *Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*, No. 2:19-cv-00225-JRG, 2020 WL 2517581, at *12 (E.D. Tex. May 15, 2020) (Gilstrap, J.) (granting plaintiff's proposed construction of plain and ordinary meaning because "Defendant's nose-of-wax approach to claim construction is not justified").

Accordingly, the Court should apply the plain and ordinary meaning to the term "determine that an abnormality is occurring."

## VI.    THE '265 PATENT

The '265 Patent is directed towards an electronic device with a specified structure that provides a cooling effect. Ex. D ('265 Patent), Abstract. As noted in the '265 Patent itself, existing electronic devices at the time of invention typically had structures that were designed for a cooling effect but also had certain disadvantages, such as separate air passages or reduced cooling effect. *Id.* at 1:15–1:62, 2:20–30. One objective of the '265 Patent is to improve the functioning of the electronic device by providing an electronic device with a better performing cooling architecture. *Id.* at 2:54–57. Specifically, "the power source units are spaced out from each other in the width direction of the housing, perpendicular to the cooling airflow direction of cooling air, in such a way that the power source units do not overlap with the electronic parts in the cooling airflow direction." *Id.* at 3:8–12.

### A.    "close to the front face" (claim 1)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | Indefinite |

The parties dispute whether a POSITA can determine with reasonable certainty the objective boundaries of the term "close to the front face." The intrinsic evidence, including the claim language and the specification, as well as the extrinsic evidence confirm that this term is not indefinite and is understood by a POSITA with reasonable certainty. Ex. A (Min Decl.) ¶¶ 29–38.

Figure 1 of the '265 Patent discloses positioning the **fans 3** with respect to the **front face** to facilitate airflow to cool other downstream components:



Ex. D ('265 Patent) at 3:56–58 ("sign F denotes a front face of the server 1").

The specification provides extensive functional guidance for fan positioning. For example, the fans must be "appropriately positioned and designed to cause an air flow in a longitudinal direction from the front side to the rear side in the housing 2." *See, e.g.*, *id.* at 4:23–29. This positioning enables intake of cooler ambient air from the front face, which then flows ***downstream*** to cool other components. *Id.* at 5:36–38, 6:57–62; Ex. A (Min Decl.) ¶ 32. Indeed, "if the fans are not placed close enough to the front face, then they would not be able to draw in cooling air from the front face and there would not be enough room to fit the other components in the housing that need to be cooled by that cooling air." *Id.* ¶ 32. Given that the specification provides a clear, objective framework for understanding how the fans must be positioned relative to the front face in order to perform the described cooling function, "a POSITA would readily understand that the placement of the fans with respect to the front face affects its ability to achieve this objective (*e.g.*,

18

by being able to draw in cool air from the front face of the server housing) and would readily understand based on his or her knowledge and experience how to achieve this objective with the fans even with different server housing and sizes." *Id.* ¶ 31.

Dell's own IPR petition fatally undermines its indefiniteness argument. There, Dell mapped prior art to this exact limitation using its plain and ordinary meaning—demonstrating that Dell's expert had no difficulty understanding the term's scope. *See, e.g.*, Ex. E ('265 IPR Petition) at 28, 67–68; *see also* Ex. A (Min Decl.) ¶ 37. Dell cannot credibly claim indefiniteness in district court while demonstrating clear understanding before the PTAB.

Federal Circuit precedent also strongly supports definiteness. "[C]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). Indeed, this is not the first time a court has opined on the construction of the term "close to" and found it to be definite. *Deere & Co. v. Bush Hog*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("The criticized words ['approach each other,' '***close to***,' 'substantially equal,' and 'closely approximate'] are ubiquitous in patent claims. Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts.") (citations omitted).

The indefiniteness opinion of Dell's expert, Dr. Michalson, fails under scrutiny:

***First***, his claim that the specification lacks "functional guidance" is demonstrably false. Ex. F (Michalson Decl.) ¶ 27. As discussed extensively above and as Dr. Min also explained, the specification provides more than ample "functional guidance"—namely, that the fans need to be placed close to the front face so that it can obtain sufficient intake air and so the other components

19

can be placed downstream of the fans in the remainder of the housing and receive the cooling air. Ex. A (Min Decl.) ¶¶ 31-35; *Sonix*, 844 F.3d at 1377 ("[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement."). Dr. Michalson's remaining arguments regarding the specification are meritless, in light of the extensive discussion in the specification regarding the term as discussed above. Ex. D ('265 Patent) at 4:23–29, 5:19–23, 6:55–62, Fig. 1.

**Second**, his prosecution history arguments confuse obviousness with indefiniteness. Ex. F (Michalson Decl.) ¶¶ 35–42. The exchanges he cites between the Examiner and Applicant focused solely on whether the "close to the front face" limitation was obvious (*id.* ¶¶ 36–39), not whether its scope was unclear. *Id.* ¶ 42 (concluding that a POSITA would need "clarification" as to the term's meaning). The Examiner never raised an indefiniteness rejection or requested clarification for this term.

**Third**, Dr. Michalson's contention that discussion of prior art references in the prosecution history injects ambiguity into the scope of the term is meritless. Ex. F (Michalson Decl.) ¶¶ 40–41. As Dr. Michalson acknowledges, the Examiner stated that Elison is "silent" as to whether the fans were place inside the housing, and so Elison alone did not disclose the limitation. *Id.* ¶ 37; *see also id.* ¶ 36 & n.1. In addition, the Examiner only referenced Lin based on its disclosure of fans being located "***inside the housing***," and ***not*** "close to the front face, in an attempt to remediate Elison's failure to disclose fans inside the housing. *Id.* ¶ 39 (citing Aug. 31, 2016 Office Action). The Applicant ultimately overcame this rejection by amending the independent claims to add the "such that the cooling air passing through one of the memory devices passes into one of the power source units" limitation, not the claim term at issue. Ex. G (Nov. 30, 2016 Office Action Response) at 2, 6–8.

*Fourth*, Dr. Michalson's hypothetical that fans *could* be placed in the "rear of the apparatus" is facially absurd. Ex. F (Michalson Decl.) ¶ 41. No POSITA would consider rear-mounted fans to be "close to the front face." Dr. Michalson does not even argue otherwise—nor could he, especially in light of the ample intrinsic evidence. Ex. D ('265 Patent) at 4:23–29, 5:19–23, 6:55–62, 3:4–12 ,7:38–60, Fig. 1.

*Finally*, his personal preference for what he would have told an engineer is unarticulated and legally irrelevant. Ex. F (Michalson Decl.) ¶ 45 ("if I were describing to an engineer a server design, I would not simply say that fans are 'close' to the front face"); *Sonix*, 844 F.3d at 1377.

Accordingly, no construction is necessary for the term "close to the front face," which should be given its plain and ordinary meaning.

## VII.  THE '320 PATENT

The '320 Patent is directed towards computer equipment that can detect the decline in the temperature of a component and adjust the fan speed accordingly. *See, e.g.*, Ex. H ('320 Patent), Fig. 6. The '320 Patent recognized that the existing systems at the time of invention did not account for adjusting the cooling fan rotation to account for "if the intake air temperature drops sharply," resulting in the "possibility that condensation occurs on the inner wall of the casing of the hard drive disk, which may induce rust" and damage the hard drive disk or cause the hard drive disk to malfunction. *Id.* at 1:66-2:4. Accordingly, an object of the invention is to "solv[e] a problem that damage or malfunction may occur in electronic components" based on changes in temperature. *Id.* at 2:19-22.

### A.  "a declination index value calculation unit" (claim 1)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "a unit dedicated to calculating declination index values" |

This clear term needs no construction. Dell's proposed construction of this term to mean

"a unit **dedicated to** calculating declination index values" simply rephrases the claim term and injects a "dedicated" requirement which finds no support in the intrinsic evidence and contradicts Dell's own IPR position.

Figure 3 discloses an embodiment of the claimed invention comprised of a **control means 172**, a **declination index value calculation means (unit) 103**, and **storing unit 18**:



Ex. H ('320 Patent), Fig. 3; *id.* at 4:4-7. Notably, Figure 3 and other portions of the specification of the '320 Patent disclose that the **declination index value calculation means 173** receives inputs, such as the detection result of the temperature sensor, from the **storing unit 18** and **control means 172**; generates outputs to at least **control means 172**; and generally communicates with other units. *See, e.g.*, *id.*, Fig. 3; *see also id.* at 7:19-29 ("[T]he **declination index value calculation means 173 *returns*** the difference calculated for each of the temperature sensors 22 to 24 **to the** **control means 172**, as a declination index value calculated **based on the detection result of each of the temperature sensors**"), 7:55-67, 8:38-55, 9:1-16, claim 1, Figs. 7–8. Pursuant to such disclosures, the specification makes clear that "[t]he **declination index value calculation means 103**…can be realized by the CPU." *Id.* at 9:17-27. A POSITA would readily understand that, based on the intrinsic evidence within the '320 Patent, the declination index value calculation unit is not limited or dedicated to performing calculations.

Dell's IPR petition destroys its current position.. There, Dell explicitly sought construction "based on its plain meaning"—not the "dedicated to" limitation it now proposes. Ex. I ('320 IPR Petition) at 9–10. Dell cannot advocate plain meaning for invalidity while demanding narrow construction for non-infringement.

Dell's proposed construction is also improper for several other reasons:

*First*, the specification "never mention[s] the word 'dedicated,'" which is "imprecise and would only confuse the jury." *PACT XPP Techs., AG v. Xilinx, Inc.*, No. 2:07-cv-00563-CE, 2011 WL 2469909, at *22 (E.D. Tex. June 17, 2011) (rejecting "dedicated" where the specification "never mention[ed] the word"); *see also Finalrod*, 2021 WL 2187980, at *8. That alone is sufficient to establish Dell's construction is improper.

*Second*, Dell admits that the specification discloses that "declination index value calculation unit" "can be realized by the CPU." Ex. H ('320 Patent) at 9:17–27; Ex. I ('320 IPR Petition) at 66 n.14, 69 n.16 (identifying "CPU 13" and its equivalents as the recited structure). A POSITA would readily understand that a CPU is capable of performing many different types of actions and calculations, and nothing in the specification suggests that any CPU would be restricted or dedicated to only "calculating declination index values," as Dell contends.

*Third*, nothing in the intrinsic evidence supports any "clear and unmistakable disavowal" that would limit the term's scope. *HC Robotics v. Int'l Trade Comm'n*, No. 2024-1193, 2025 WL 2424283, at *5 (Fed. Cir. Aug. 22, 2025) (declining to limit the disputed term where there was no clear and unmistakable waiver of scope); *Lochner Techs., LLC v. Hewlett-Packard Co.*, No. 2:09-cv-00177-CE, 2010 WL 4179200, at *9–10 (E.D. Tex. Oct. 20, 2010) (declining to limit a term because "[the patentee] never clearly disavowed the possibility" of the claim term performing other functions).

Accordingly, the Court should apply the plain and ordinary meaning to "declination index value calculation unit" and decline to construe it.

## VIII.   THE '273 PATENT

The '273 Patent is directed towards a node system, server apparatus, scaling control method, and program for providing an improved redundant server configuration. Ex. J ('273 Patent), Abstract; *id.* at 3:47–62. The existing node systems at the time of invention could not "effectively utilize resources due to the processing of increasing/decreasing VMs" because "a delay was required for process allocation and taking over when the system is scaled up/down by increasing/decreasing VMs [i.e., virtual machines] according to the processing load." *Id.* at 2:63–66. In addition, such systems also have "a problem of process failure in a scale-down situation…." because the processes assigned to deleted virtual CPUs were not re-assigned. *Id.* at 2:66–67; *see also id.* at 8:5–9.

One objective of the '273 Patent is to improve the functioning of the server system by providing one that is "capable of reducing a processing delay in at least one of scale-up and/or scale-down," which in turn decreases the chances of failure during the switching between the active and standby systems. *Id.* at 3:1–5. To do so, the '273 Patent discloses that while "an active system…executes processing," there is "a standby system that is able to perform at least one of scale up and scale down" and a "control apparatus that controls system switching to switch the standby system undergoing the scale up or scale down to a new active system." *Id.* at 3:6–12; *see also id.* at 3:13–46.

### A.  "standby system" (claims 1, 8, 18, 19)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "a system that can take over service for an active system and remains in an operative state while scaling up or down the number of virtual CPUs" |

"Standby system" is a well-known term of art requiring no construction. Dell's proposed construction improperly limits the scope of the term in a manner that is inconsistent with the intrinsic evidence and would improperly import limitations from embodiments in the specification.

Figure 1 of the '273 Patent discloses a system comprised of three main components: "an active system 101 that executes processing, a *standby system 102* **that can be scaled up and/or scaled down**, and a control apparatus (control means) 103 that controls system switching to switch the standby system 102 undergoing the scale up or scale down to a new active system":

FIG. 1



Ex. J ('273 Patent), Fig. 1; *id.* at 4:36–42. Figure 5 discloses additional information about this system:

FIG. 5



25

*Id.*, Fig. 5. "An **application (software) (APL) 27** running on a **virtual machine (VM) 25** on a **server (physical machine) 21** constitutes a standby system (SBY system). . . . In a case where the **application 27** of the **virtual machine 25** of the **standby system server 21** stands by, in a state where the current active system is scaled up, the virtual hardware resources such as virtual CPUs (vCPUs) allocated to the standby system are increased and processes are assigned to the added virtual CPUs (vCPUs) . . . . In a case [of] . . . scale[] down, assignment of the processes to the virtual CPUs (vCPUs) of the virtual machine to be removed is released, and then the virtual hardware resources, such as the virtual CPUs (vCPUs) and so forth, to be removed, are released."

*Id.* at 8:64–9:13. By way of example, Figures 2A and 2B illustrate the scaling process:



*Id.*, Figs. 2A–2B. "The standby system (SBY) in FIG. 2B is scaled up (in this case, two more virtual CPUs (vCPUs) are increased (Hotadded), compared to the active system (ACT) executing processing (e.g., session processing) in FIG. 2A." *Id.* at 6:49–57.

In addition, the specification juxtaposes the "standby system" to the "active system" and consistently describes the "standby system" as simply a system that is capable of scaling up or down in order to become an active system after switching. *See, e.g.*, *id.* at 3:21–27 ("According to yet another aspect of the present invention, there is provided a server apparatus including at least a standby system of a redundant system constituted by *an active system and the standby system*, the server apparatus comprises a unit that *switches the standby system to a new active system*,

after scaling (scaling up or scaling down) the standby system in advance."), 3:38–41, 4:36–54; *see also id.* at 3:6–12, 6:49–57, 7:3–8, 7:25–40, 8:64–9:13, 11:65–12:15, 13:49–63, 14:19–23, 14:42–55, 15:5–40, 15:50–16:45, 16:50–17:24, 17:50–18:19, 19:7–50, 19:61–20:31. A POSITA would readily understand that the specification refers to the "standby system" in a manner consistent with its plain and ordinary meaning as a term of art in this field of invention.

Dell's proposed construction of "standby system" should be rejected for several reasons:

***First***, Dell's proposed construction is unsupported by the specification. In its discussion of the embodiment in Figure 2B, the specification discloses that when the "standby system (SBY) . . . is scaled up[,]…two or more virtual CPUs (vCPUs) are increased (Hotadded)." *Id.* at 6:49–52. The specification goes on to state: "***For example***, in Hotadd device(s) (vCPUs ***in this example***) ***can*** be added ***without stopping the virtual machine (VM)*** . . . ." *Id.* at 6:49–57. In other words, the specification simply describes exemplary standby system devices with "Hotadd" capabilities that allow, but do not require the VM to continue to run without stopping. *Finalrod*, 2021 WL 2187980, at *8.

***Second***, Dell's proposed construction would import a limitation from an embodiment into the claims, which runs counter to the permissive and exemplary language in the specification (*id.* at 6:49–57) and would improperly exclude the full scope of the term "standby system" that the patentee is entitled to, including systems where VMs may be stopped when vCPUs are added. *See, e.g.*, *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."); *Thomas Swan & Co. Ltd. v. Finisar Corp.*, No. 2:13-cv-00178-JRG, 2014 WL 2885296, at *4–7 (E.D. Tex. June 25, 2014) (refusing to read limitations from permissive and exemplary language in preferred embodiment into term "spatial light modulator"); *Semcon IP*

27

*Inc. v. Louis Vuitton N. Am., Inc.*, No. 2:19-cv-00122-JRG, 2020 WL 2544774, at *9–10 (E.D. Tex. May 19, 2020) (similar for term "operating conditions of the central processor").

**Third**, Dell cannot show that the applicant clearly disclaimed or disavowed the term's full scope. The Federal Circuit holds such disclaimer or disavowal requires a high bar and must be "clear and unmistakable." *Thorner*, 669 F.3d at 1366–67. None of Dell's citations to the intrinsic evidence suggest any clear and unmistakable disclaimer or disavowal. *See, e.g.*, *In re Taasera Licensing LLC, Pat. Litig.*, No. 2:22-MD-03042-JRG, 2023 WL 8628323, at *3–4 (E.D. Tex. Dec. 13, 2023) (collecting cases; disclaimer requires "clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . .'").

As a result, no construction is necessary for the term "standby system" and the Court should reject Dell's proposed construction.

### B. "the standby system, responsive to the instructions, in case of performing the scale-down" (claim 18)

| Cloud Byte's Construction | Dell's Construction |
|---|---|
| "the standby system, responsive to the instruction, in case of performing the scale-down" | Plain and ordinary meaning |

The parties dispute whether the term "instructions" should be singular or plural. Since the intrinsic evidence clearly demonstrates that the term "instructions" was inadvertently left in its plural form in claim 18, the Court should correct the clear, typographical error in this term in accordance with Cloud Byte's proposed construction. *Pavo*, 35 F.4th at 1373 ("A district court may correct obvious minor typographical and clerical errors in patents" where "the correction is not subject to reasonable debate based on consideration of the claim language and the specification" and "the prosecution history does not suggest a different interpretation of the claims") (citation omitted).

28

As an initial matter, claim 18 itself reveals that the typographical error of the term "instructions" is clear and inadvertent. The antecedent basis of the term "the instructions" refers to an earlier limitation that recites "issuing an ***instruction*** to the standby system to perform scale-up or scale-down." Ex. J ('273 Patent), claim 18. In addition, the very next limitation in claim 18 correctly recites the singular "instruction," *i.e.*, "responsive to ***the instruction***," based on the same antecedent basis. The other claims of the '273 Patent all consistently recite that the standby system acts "responsive to the ***instruction***." *Id.*, claims 1, 6, 7, 8, 9, 10, 11, 16, 17, 20, 21.

The prosecution history confirms the error was inadvertent. When amending claims to add "responsive to the instruction," the applicant used the singular "instruction" in every claim except claim 18—an obvious oversight. *See* Ex. K (Sept. 9, 2019 amendment to '273 Patent) at 2, 3, 5, 7–10, 12, 15.

Indeed, the specification uniformly refers to the singular "instruction." *See, e.g.*, Ex. J ('273 Patent) at 4:43–46 ("…the control apparatus 103 instructs the standby system 102 to perform scale up or scale down, according to processing load or the like of the active system 101 (or, ***an instruction*** …."), 5:15–17 ("….when determining that scaling down is required on the basis of settings or ***an instruction*** (e.g., input of a scaling down ***instruction***)….").

This Court has corrected similar clear, typographical errors during claim construction. *See, e.g.*, *R2 Sols. LLC v. Deezer S.A.*, No. 4:21-cv-00091, 2022 WL 36240, at *18–21 (E.D. Tex. Jan. 4, 2022) (correcting clear typographical error to match language in other claim limitations and specification); *CDN Innovations, LLC v. Grande Commc'ns Networks, LLC*, No. 4:20-cv-00653-SDJ, 2021 WL 3615908, at *20–22 (E.D. Tex. Aug. 13, 2021) (correcting clear typographical error to match language in other claims, specification, and term's antecedent basis).

It is unclear what discernable difference in scope or meaning Dell perceives would exist

with the correction, given its proposal that the plain meaning should be applied to this term. Once the clear, typographical error for this term is resolved pursuant to Cloud Byte's proposed construction, Cloud Byte agrees that the plain and ordinary meaning should apply.

As a result, the Court should fix the clear, typographical error.

## IX.    CONCLUSION

For the foregoing reasons, Cloud Byte respectfully requests that the Court adopt Cloud Byte's proposed constructions and reject Dell's proposed constructions.

Dated:  September 5, 2025

*/s/ Yury Kapgan with permission Brian Mack*
Yury Kapgan (admitted in EDTX)
yurykapgan@quinnemanuel.com
Ryan Goldstein (admitted in EDTX)
ryangoldstein@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Brian Mack (admitted in EDTX)
brianmack@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6400
Facsimile: (415) 875-6700

*Of Counsel:*
Claire Abernathy Henry
Texas State Bar No. 24053063
Andrea Fair
Texas State Bar No. 24078488
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Fax: (903) 757-2323
claire@millerfairhenry.com
andrea@millerfairhenry.com

*Attorneys for Plaintiff Cloud Byte LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 5, 2025, the foregoing document was served by email on all counsel of record.

/s/ *Yury Kapgan*
Yury Kapgan