# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| CLOUD BYTE LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 2:24-CV-00637-JRG |
| DELL INC. and DELL TECHNOLOGIES INC., | § § § § | |
| *Defendants*. | § § § | PUBLIC VERSION |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss for Improper Venue Under Rule 12(b)(3) (the "Motion") filed by Defendants Dell Inc. and Dell Technologies Inc. (collectively, "Dell"). (Dkt. No. 20.) Having considered the Motion, the Court finds that it should be **DENIED**.

### I. BACKGROUND

On August 5, 2024, Plaintiff Cloud Byte LLC ("Cloud Byte") filed a multi-patent complaint against Dell. (Dkt. No. 1.) On October 11, 2024, Dell filed the Motion, moving to dismiss for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure. (Dkt. No. 20.) Following the Motion, the Court granted Cloud Byte's unopposed motion to conduct limited venue discovery. (Dkt. No. 26.)

### II. LEGAL STANDARD

A party may move to dismiss an action for "improper venue." Fed. R. Civ. P. 12(b)(3). "Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff." *ATEN Int'l Co., Ltd. v. Emine Tech. Co., Ltd.*, 261 F.R.D. 112, 120-21 (E.D. Tex. 2009) (cleaned up). A plaintiff may carry its burden by presenting facts, when taken

as true, that establish venue. *Id*. The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:13-cv-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237-38 (5th Cir. 2009)).

"[V]enue facts are to be examined as of the date the suit is filed." *Personal Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922, 924 (E.D. Tex. 2017). The Federal Circuit has emphasized that "each case depends on its own facts" and "no one fact is controlling." *In re Cray Inc.*, 871 F.3d 1355, 1362, 1366 (Fed. Cir. 2017). If venue is improper, the Court must dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

In an action for patent infringement, 28 U.S.C. § 1400(b) controls venue. Pursuant to 28 U.S.C. § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Under the first prong, the Supreme Court held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1517 (2017). Under the second prong, the Federal Circuit has interpreted a "regular and established place of business" to impose three general requirements: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). Failure to satisfy any statutory requirement requires a finding of improper venue. *Id.*

### III. DISCUSSION

Cloud Byte argues that venue is proper because Dell has committed acts of infringement in the Eastern District of Texas and has a regular and established place of business in the Eastern District of Texas based on (1) Communications Test Design, Inc.'s ("CTDI") Flower Mound Facility in this District, (2) Dell's field employees residing in this District, (3) Dell's partners located in this District, and (4) Dell's managed services at Boeing's Plano office in this District. (*See generally* Dkt. No. 63.) The Court finds that venue is proper in the Eastern District of Texas based at least on CTDI's Flower Mound Facility. Consequently, the Court need not address Cloud Byte's other arguments.

#### A. Dell Does Not Reside in the Eastern District of Texas

Dell is incorporated in Delaware. (Dkt. No. 20 at 3.) A domestic corporation "resides" only in its state of incorporation for purposes of patent venue. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 260 (2017). Since Dell is not incorporated in Texas, it does not reside in this District. As a result, venue is improper under the first prong of § 1400(b).

#### B. Dell Has a Regular and Established Place of Business in this District for Venue

The facts of this case are similar to the facts of *AGIS Software Dev. LLC v. Google LLC*, No. 2:19-cv-00361-JRG, 2022 WL 1511757 (E.D. Tex. May 12, 2022) and *Personalized Media Commc'ns, LLC v. Google LLC*, No. 2:19-cv-00090, Dkt. No. 291 (E.D. Tex. July 30, 2020) (hereinafter, "PMC"). In both cases, the Court found that Google's relationship with CDTI was sufficient for the purpose of venue. The Court reaches the same conclusion here.

##### i. The CTDI Flower Mound Facility is a Physical Place in this District

Under the first *Cray* factor, "there must be a physical place in the district." *In re Cray*, 871 F.3d at 1360. The place need only be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.*

3

It is undisputed that CTDI provides a physical location for Dell at its facility in Flower Mound, Texas (Dkt. No. 63-5 at 6.), and that the CTDI Flower Mound Facility is located in this District at 501 Lakeside Parkway, Flower Mound, Texas 75028. (*Id.* at 6, 29.) CTDI owns the Flower Mound Facility. (Dkt. No. 63 at 5.) At CTDI's Flower Mound Facility, CTDI performs telecommunications and rack integration services for Dell. (Dkt. 63-3 at 4, 10:16-17). Dell employees also regularly work in the Flower Mound Facility in the space Dell contracts for.

In July 2019, CTDI and Dell entered into a Master Relationship Agreement ("MRA"). (Dkt. No. 63-4 at 2.) In July 2022, CTDI and Dell entered into the Statement of Work B ("SOW B"), which set forth additional terms and conditions to the MRA. (Dkt. No. 63-5 at 2, 4). In February 2023, Dell and CTDI further entered into Amendment No. 1 to SOW B ("SOW Amendment"), which updated Dell's security requirements for CTDI. (Dkt. No. 63-6 at 2, 3.) The SOW B provides that "[i]n the event of any conflict between the terms and conditions of the [MRA] and the terms and conditions of this SOW, the terms and conditions of this SOW shall govern, unless otherwise provided herein." (Dkt. No. 63-5 at 4.) Pursuant to SOW B, CTDI "provide[s] Second Touch Services to Dell's customers on Dell's behalf" at the Flower Mound Facility. (Dkt. No. 63-5 at 5.)

The Federal Circuit has explained that a "place of business" is not restricted to real property the defendant owns or leases, but can be "any physical place that the defendant could 'posses[] or control.'" *In re Google*, 949 F.3d 1338, 1343 (Fed. Cir. 2020) (citing *Cray*, 871 F.3d at 1363). Dell controls the physical location of its operations within the Eastern District, as SOW B sets out that "[CTDI] may not change the location of the [Flower Mound] Facility… without obtaining Dell's prior written consent." (Dkt. No. 63-5 at 7.) Further, there are references in SOW B to a "Dell area" within the Facility (*Id.* at 52), similar to the "Google Secured Area" at issue in *AGIS* and

4

*PMC*. SOW B requires that work completed for other clients must have a "physical separation from Dell product," and CCTV must "monitor the physical separation dividing areas." (*Id*.)[1] It further states that "Access into the Dell area must be controlled. Only authorized personnel are allowed inside the Dell area." (*Id*.) SOW B identifies the total square feet within the Facility which is "dedicated to Dell" as 24,000 square feet, at a price of ▮▮▮▮▮. (*Id*. at 8.) Mr. Eaton, Dell's corporate representative, also provided testimony stating that projects may be moved around *within* the 24,000 square feet of the Dell area, but that when they are moved, they remain "still within the 24,000 square feet" until they are "prep[ed] for shipment" and sent "out the door." (Dkt. No. 63-3 at 23:6-9.)

Much like in *AGIS* and *PMC*, the Court finds that Dell has a "dedicated, physical space for its operations within the Flower Mound Facility." *PMC*, No. 2:19-cv-00090, Dkt. No. 291 at 4. Dell pays by the square foot for its dedicated area within this Facility, and requires that there be a physical separation of this with special security features instituted to protect this area. The area cannot be moved from this specific Facility by CTDI without prior written consent from Dell. As such, Dell exercises sufficient control over the "Dell area" within CTDI's Flower Mound Facility to render this area a physical place in the Eastern District of Texas satisfying the first *Cray* factor.

      ii.    <u>The CTDI Flower Mound Facility is a Regular and Established Place of Business</u>

Under the second *Cray* factor, a "regular and established place of business" requires "the regular, physical presence of an employee or other agent of the defendant conducting the

---

[1] At the hearing on this matter, counsel for Dell said that there are not currently any CCTV cameras in use at the Flower Mount Facility. (Dkt. No. 118 at 21.) However, the evidence in the record states that CCTV cameras are required to be used at the facility (*see* SOW B, Dkt. No. 63-5 at 7), and Dell's corporate representative was not able to say for certain whether CCTV cameras are in use or not (Dkt. No. 63-3 at 102:25). Since the Court "must… resolve all conflicts in favor of the plaintiff," (*See Mayfield*, 2014 WL 978685 at \*1), the Court operates under the assumption that there are indeed CCTV cameras at the Flower Mound Facility monitoring the Dell area. At the very least, Dell is entitled to require these CCTV cameras be installed and operated to provide targeted security at any time.

defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345. Cloud Byte argues that the Dell area meets the second *Cray* factor both because Dell's employees have a regular and physical presence in the Dell area, and because CTDI employees act as Dell's agent at this Facility. Given that the Court finds the second *Cray* factor is met by the regular and established physical presence of Dell employees at the CTDI Facility, it need not address whether CTDI employees act as Dell's agents within the Facility.

Cloud Byte contends that Dell's employees regularly visit and conduct Dell business within the Dell area of the Flower Mound Facility. Cloud Byte relies on both the testimony of Dell's corporate representative, Mr. Eaton, and the visitor logs produced by CTDI. In his deposition, Mr. Eaton discussed three Dell employees who help "enable CTDI" to "support [Dell's] outcome-based requirements" under their contracts. (Dkt. No. 63-3 at 14:5, 14:12.) Mr. Eaton identified by name Mr. Gonzcar, Mr. Smesny, and Mr. Bitner, stating that Mr. Gonzcar "is responsible for the enablement of [Dell's] suppliers," including CTDI, that Mr. Smesny "works for [Gonzcar], so he's part of the enablement team," and that Mr. Bitner "helps [Gonzcar] enable in this case the – the ability for [Dell] to support the telco business at CTDI." (*Id*. at 14:3-5, 15:12-13, 16:4-5.) Mr. Eaton further identified a Dell project manager, Ms. Henager, whom he stated was "on average, [on-site] once a week" at the CTDI Facility assisting with rack integration being performed there. (*Id*. at 18:4-5, 23:21-24:25). Mr. Eaton finally discussed Mr. Jackson and Mr. Black as additional Dell employees whom he was aware had worked at CTDI. (*Id*. at 26:1-9.)

The visitor logs covering eight months (from July 2024 to February 2025) produced by CTDI demonstrate that within this period, at least 16 different Dell employees were present at the Flower Mound Facility over at least 33 discrete times and dates. (Dkt. No. 63-10.) Cloud Byte also asserts that "the number of Dell employees visiting the Flower Mound Facility is likely understated

6

given that many of the log entries do not list a company affiliation and there are large gaps of time in the log entries." (Dkt. No. 63 at 7 n.6; *see generally* Dkt. No. 63-10.) While the logs show entries for nearly every day for July and August, entries become much sparser from September to February with no explanation. (*Compare* Dkt. No. 63-10 at 2-33, *with* Dkt. No. 63-10 at 34-42.) Further, Cloud Byte points out that "none of the Dell employees Mr. Eaton identified are on the partial visitor logs," which "strongly suggests that they are incomplete and many more Dell employees visited the Flower Mound Facility than Dell's corporate witness acknowledged." (Dkt. No. 63 at 7.)

Finally, SOW B requires that CTDI "be ready and available for daily operations," and that Dell can expect CTDI to be available beyond these hours with advance notice. (Dkt. No. 63-5 at 6.) It further sets out that CTDI "must staff production hours, Monday through Friday, 7:00 A.M. to 1:00 A.M., Central Standard time, as required to meet customer commitments." (*Id*. at 26.) This agreement clearly contemplates that the CTDI facility will be used regularly, if not "daily," to perform crucial work by Dell in the Dell designated space. Additionally, the SOW B contemplates "weekly task meetings" where "current service issues will be discussed," as well as a "Monthly Business Review" and "Quarterly Business Reviews." (*Id*. at 27.) These meetings can also be held "as often as requested by Dell. (*Id*.) While these provisions do not specify where these meetings will take place, at the very least, they set out that there is an open line of communication and ongoing contact between CTDI and Dell employees regarding the work performed at the Flower Mound Facility.

As in *AGIS*, Cloud Byte has produced evidence that Dell and CTDI both "did not actively track or monitor the total number of… employees traveling to the Flower Mound Facility." *AGIS*, 2022 WL 1511757 at *3 (internal quotation marks omitted). As this Court noted in *AGIS*,

"although not dispositive, the failure to track and monitor… employees' visitation to the Flower Mound Facility suggests that the physical presence of such employees within the EDTX was regular and established." *Id*. Further, the record reflects that the employees who did visit the facility carried out work that was essential to the services CTDI performs for Dell, relating to services like "the telco business" (Dkt. No. 63-3 at 16:5) and "rack integration" (Dkt. No. 63-3 at 23:22) at the Flower Mound Facility. As such, the Court finds that Dell has a regular and established place of business withing the EDTX satisfied by the regular physical presence of its employees.

### iii. The CTDI Flower Mound Facility is a Place of Dell

Under the third *Cray* factor, "'the regular and established place of business' must be 'the place of the defendant.'" *In re Cray*, 871 F.3d at 1363. To be the place of the defendant, "the defendant must establish or ratify the place of business." *Id.* A court may consider "whether the defendant owns or leases the place"; "exercises other attributes of possession or control over the place"; "[m]arketing or advertisements … but only to the extent they indicate that the defendant itself holds out a place for its business"; "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory"; or whether the defendant "places its name on a sign associated with or on the building itself." *Id.* at 1363-64.

SOW B identifies the address of the Flower Mound Facility as the "Facility Location," and states that CTDI "may not change the location of the Facility… without obtaining Dell's prior written consent." (Dkt. No. 63-5 at 29, 7.) As previously noted, SOW B further provides for a lease-like agreement wherein the space "dedicated to Dell" is 24,000 contiguous square feet, for which Dell pays a monthly price of ▇▇▇▇▇▇▇▇▇▇▇▇. (Dkt. No. 63-5 at 8.) Even if this agreement does not create an enforceable real property interest, as Dell has argued (Dkt. Nos. 78 at 8; 118 at 22), it is certainly an arrangement conveying lease-like rights and benefits

8

to Dell, with a substantial monthly payment for the ongoing use of an identified amount of space. Dell sends employees to the Facility regularly (*see supra* Section III.B.ii) and it exercises control over CTDI's conduct within the Dell area while working on Dell projects. (*See, e.g.*, Dkt. No. 63-5 at 52 (SOW B setting out that "access into the Dell area must be controlled"); Dkt. No. 63-5 at 69 (SOW B requiring CTDI to provide to Dell daily, weekly, and quarterly reports regarding business and inventory at the Facility); Dkt. No. 63-3 at 22:8-13 and 23:4-13 (Mr. Eaton describing how CTDI may not work on non-Dell projects within Dell's 24,000 square feet, and how the entire process of rack integration for Dell is completed within that space).)

Additionally, Mr. Eaton's testimony confirms that Dell customers do not communicate with CTDI directly, and that CTDI representatives are "not allowed to talk to… Dell direct customers." (Dkt. No. 63-3 at 38:24-39:8.) Mr. Eaton stated that when telling customers to send their products to CTDI, Dell "tell[s] the customer to purchase and send it to [the Flower Mound Facility] address… with the information to allow *us* to receive it." (*Id*. at 72:19-23, emphasis added.) He further provided that the customer "knows [their item is] being sent to a Dell partner," and not to CTDI specifically. (*Id*. at 73:2-6.) As in *PMC*, the use of the word "us" used in reference to the work completed suggests Dell acknowledges this Facility out as their own. *See PMC*, No. 2:19-cv-00090, Dkt. No. 291 at 11.

SOW B further sets out, under "Labelling Requirements," that "For each shipment, [CTDI] agrees an external label must be produced that will include but is not limited to: Customer PO number, Dell Part Number, Dell PO number, delivery note number, manufacturer part number and quantity" (Dkt. No. 63-5 at 25), where a "part number" is defined as a "unique identifier assigned to Products by Dell" (*Id*. at 23). This establishes that out-going shipments from the CTDI facility

9

are sent back out to customers[2] with unique Dell identifiers representing (or at a minimum suggesting) that Dell itself has completed the work.

As in *PMC*, the Court finds that Dell "establishes this place of business by not only specifying the Flower Mound Facility as the location at which CTDI will provide services, but also requiring there to be a [Dell area] in the Flower Mound Facility. [Dell] then ratifies the Flower Mound Facility as its place of business by holding it out to be [Dell] itself." *PMC*, No. 2:19-cv-00090, Dkt. No. 291 at 11 (internal citations omitted).

Finally, this Court believes it is important to note that the evidence and arguments presented in the briefing and at the hearing strongly suggest that Dell has intentionally crafted a contract with CTDI that allows it to engaged in commerce in EDTX while avoiding venue in this district. It has done so with the explicit benefit of this Court's and the Federal Circuit's analysis in *AGIS* and *PMC*. This Court is persuaded that Dell has intentionally obscured its relationship with CTDI and the Flower Mound Facility in an effort to avoid acknowledging the Facility as a "place of Dell" under the third *Cray* factor.[3]

However, our jurisprudence has long recognized, across many areas of the law, that a party has not acted in good faith where they have gone to substantial and material lengths to avoid detection or obfuscate the truth.[4] Dell should not be able to avoid venue in this district while

---

[2] Cloud Byte's counsel argued at the hearing on this matter that Mr. Eaton stated he was not sure whether the labels can be identified as Dell's, and that Cloud Byte asked for but did not receive any labels from Dell. (Dkt. No. 118 at 44.) At the very least, the work CTDI performs for Dell is required by SOW B to be sent back out in this manner.

[3] Dell has done this, in part, by avoiding a designation of the "Dell area" as a "secured area" akin to the "Google Secured Area," and by ensuring that Dell customers "know that [their products are] being sent to a Dell *partner*" (Dkt. No. 63-3 at 73:4, emphasis added) rather than Dell itself while still ensuring that CTDI employees are "not allowed to talk to… Dell direct customers" (*Id*. at 39:7-8).

[4] *See, e.g.*, *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983) (holding that a factor relevant to determining whether a Chapter 13 plan has been proposed in good faith is "whether any inaccuracies [in statements by the proponent] are any attempt to mislead the court"); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (holding that Rule 10b-5 is violated where assertions made to the investing public are "false or misleading or are so incomplete as to mislead irrespective of whether issuance of the release was motivated by corporate officials for ulterior purposes"); *Aircast Inc. v. Royce Medical Co.*, 928 F.2d 412, 1991 WL 22350, *1 (Fed. Cir. 1991)

10

reaping the benefits of doing business here through a contractual process of obscuring the reality of their commercial undertakings. Despite Dell's denials, these facts call to mind the observation attributed to Walter Reuther, "If it looks like a duck, walks like a duck and quacks like a duck, then it just may be a duck."[5] The Court finds that the Flower Mound Facility is a place of Dell under *Cray*.

## IV. CONCLUSION

For the reasons stated herein, the Court **DENIES** Dell's Motion to Dismiss for Improper Venue Under Rule 12(b)(3) (Dkt. No. 20) as set forth above. The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 12th day of September, 2025.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

("Inequitable conduct before the PTO can be grounded on a finding that material prior art was knowingly withheld from the PTO during prosecution of a patent application, with the intent to mislead").

[5] *Oxford Dictionary of Quotations* 645:13 (6th ed. 2004).