**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| CLOUD BYTE LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 2:24-CV-00637-JRG |
| DELL INC. *and* DELL TECHNOLOGIES, INC., | § | |
| | § | |
| *Defendants*. | § | |

**CLAIM CONSTRUCTION ORDER**

On October 31, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patents Nos. 7,739,544, 9,482,632, 9,560,177, 9,629,265, 9,651,320, 9,900,249, and 10,628,273.

Before the Court are the Opening Claim Construction Brief (Dkt. No. 120) filed by Plaintiff Cloud Byte LLC, the Responsive Claim Construction Brief (Dkt. No. 124) filed by Defendants Dell Inc. and Dell Technologies, Inc. ("Dell"), and Plaintiff's reply (Dkt. No. 127). Also before the Court is the parties' July 25, 2025 Joint Claim Construction and Prehearing Statement (Dkt. No. 107) and the parties' October 3, 2025 Joint Claim Construction Chart (Dkt. No. 133).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

I. BACKGROUND..................................................................................................... 2

II. LEGAL PRINCIPLES ........................................................................................ 5

III. AGREED TERMS............................................................................................... 8

IV. DISPUTED TERMS IN U.S. PATENT NO. 7,739,544 ..................................... 9

    1. "means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module" ......................................... 9

    2. "backup storage device" ...................................................................................... 14

V. DISPUTED TERMS IN U.S. PATENT NO. 9,482,632 ..................................... 19

    3. "determine that an abnormality is occurring"..................................................... 19

VI. DISPUTED TERMS IN U.S. PATENT NO. 9,629,265..................................... 25

    4. "close to the front face" ...................................................................................... 25

VII. DISPUTED TERMS IN U.S. PATENT NO. 9,651,320 ................................... 31

    5. "a declination index value calculation unit" ....................................................... 31

VIII. DISPUTED TERMS IN U.S. PATENT NO. 10,628,273................................ 36

    6. "standby system" ................................................................................................. 36

    7. "the standby system, responsive to the instructions, in case of performing the scale-down" ............................................................................................................... 44

IX. CONCLUSION.................................................................................................... 44

APPENDIX A ............................................................................................................ 46

## I. BACKGROUND

Cloud Byte alleges infringement of United States Patents No. 7,739,544 ("the '544 Patent"), 9,482,632 ("the '632 Patent"), 9,560,177 ("the '177 Patent"), 9,651,320 ("the '320 Patent"), 9,629,265 ("the '265 Patent"), 9,900,249 ("the '249 Patent"), and 10,628,273 ("the '273 Patent"). Dkt. No. 120, Exs. B, C, D, H, J, M & N.

The '544 Patent, titled "Disk Array System and Rebuild Method Thereof," issued on June 15, 2010, and bears an earliest priority date of March 10, 2005. Plaintiff submits that "the '544 Patent addresses a critical problem in redundant disk array systems: the severe performance

degradation that occurs during disk rebuilding after failure." Dkt. No. 120 at 2. The Abstract of

the '544 Patent states:

> Disclosed is a disk array system which includes a plurality of disks constituting a disk array and a backup storage for backing up data in the disk array and performs control so that when a failed disk among the disks constituting the disk array is replaced with the replacement disk, restoration of data in the replacement disk is performed using the backup device.

The '632 Patent, titled "Abnormality Detection Device," issued on November 1, 2016, and

bears an earliest priority date of September 5, 2012. Plaintiff submits that "the '632 Patent is

directed toward detecting abnormalities in the Information and Communication Technology

('ICT') equipment." Dkt. No. 120 at 12. The Abstract of the '632 Patent states:

> An estimating unit 51 estimates the upper limit of possible temperatures in a predetermined position of ICT equipment when the quantity of intake air into the ICT equipment is appropriate, based on the result of detection by an operational status detecting unit that detects the operational status of the ICT equipment and the result of detection by an intake-air temperature sensor 62 that detects the temperature of intake air of the ICT equipment. A determining unit 52 determines that an abnormality is occurring when the result of detection by a temperature sensor 63 that detects the temperature in the predetermined position is beyond the upper limit estimated by the estimating unit.

The '177 Patent, titled "Network System and Network Flow Tracing Method," issued on

January 31, 2017, and bears an earliest priority date of February 17, 2011. The Abstract of the

'177 Patent states:

> A switch apparatus includes a storage storing a table, the table including rules and actions corresponding to the rules, and a controller including a memory storing instructions, and a processor configured to execute the instructions to receive the rules and the actions from a control apparatus, identify, based on the rules, a received packet, duplicate a part of a header of the identified packet as an additional header when the identified packet includes a target of encapsulation, encapsulate the identified packet by the additional header, and process, based on the actions, the identified packet.

The '320 Patent, titled "ICT Equipment," issued on May 16, 2017, and bears an earliest

priority date of March 2, 2012. Plaintiff submits that "[t]he '320 Patent is directed towards

computer equipment that can detect the decline in the temperature of a component and adjust the fan speed accordingly." Dkt. No. 120 at 21. The Abstract of the '320 Patent states:

The temperature sensor detects a component temperature of an electronic component included in the ICT equipment. The declination index value calculation means calculates a declination index value indicating the degree of declination of the component temperature of the electronic component, based on the detection result of the temperature sensor. As a declination index value, a declination quantity of the component temperature per unit time or a difference between the highest value of the component temperature in a past certain period and the current component temperature may be used, for example. The control means controls the number of rotations of the cooling fan in accordance with the declination index value calculated by the declination index value calculation means. More specifically, the control means causes the number of rotations of the fan to be lower as the degree of declination of the component temperature indicated by the declination index value is larger.

The '249 Patent, titled "Communication System, Forwarding Node, Path Management Server, Communication Method, and Program," issued on February 20, 2018, and bears an earliest priority date of September 14, 2009. The Abstract of the '249 Patent states:

A packet forwarding node includes a storage unit to store a packet forwarding table used for forwarding a packet based on an identifier which identifies a link between nodes on a packet forwarding path and a forwarding unit to receive an incoming packet including a plurality of the identifiers, and to forward the incoming packet based on an identifier corresponding to the packet forwarding node.

The '265 Patent, titled "Cooling Structure of Electronic Device," issued on April 18, 2017, and bears an earliest priority date of March 5, 2012. Plaintiff submits that "[t]he '265 Patent is directed towards an electronic device with a specified structure that provides a cooling effect." Dkt. No 120 at 17. The Abstract of the '265 Patent states:

A cooling structure is designed for an electronic device including a plurality of fans causing cooling air, a plurality of electronic parts serving as heat sources, and a plurality of power source units, all of which are arranged inside the housing. The electronic parts are positioned in the downstream side of cooling air produced by the fans, while the power source units are positioned in the further downstream side of cooling air compared to the electronic parts. The power source units are spaced out from each other in the perpendicular direction to the cooling airflow direction of cooling air such that the power source units do not overlap with the electronic parts in the cooling airflow direction in plan view. The cooling structure prevents

cooling air, which is temporarily warmed by the electronic parts, from directly flowing into the power source units, thus improving a cooling effect.

The '273 Patent, titled "Node System, Server Apparatus, Scaling Control Method, and Program," issued on April 21, 2020, and bears an earliest priority date of January 30, 2015. Plaintiff submits that "the '273 Patent is directed towards a node system, server apparatus, scaling control method, and program for providing an improved redundant server configuration." The Abstract of the '273 Patent states:

> A system includes an active system that executes processing, a standby system that is able to perform at least one of scale-up and scale-down, and a control apparatus that controls system switching to set the standby system undergoing the scaled up or scaled down as a new active system.

Shortly before the start of the October 31, 2025, hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary

underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term

a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert

testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.  AGREED TERMS

In the July 25, 2025, P.R. 4-3 Joint Claim Construction and Prehearing Statement, the parties set forth several agreed-upon constructions. Dkt. No. 107 at 1–2. Those agreements are set forth in Appendix A to this Claim Construction Order.

## IV.  DISPUTED TERMS IN U.S. PATENT NO. 7,739,544

1.  **"means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module"**

| **"means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module"** (''544 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Governed by 35 U.S.C. § 112, ¶ 6 <br><br> Function: <br>    "rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module" <br><br> Structure: <br>    "disk access bus/switch 18 as described in 3:33–42, 4:29–52, 5:10–32, and 9:9–19 and equivalents thereof" | Governed by 35 U.S.C. § 112, ¶ 6 <br><br> Function: <br>    "rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module" <br><br> Structure: <br>    "rebuild module 17 following the algorithm disclosed in steps S44, S45, and S46 of Fig. 5, along with disk access bus/switch 18 (and equivalents thereof)" |

Dkt. No. 107, Ex. A at 2; Dkt. No. 133, App'x A at 1–2.

Shortly before the start of the October 31, 2025 hearing, the Court provided the parties with the following preliminary construction: "Governed by 35 U.S.C. § 112, ¶ 6" / Function: "rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module" / Corresponding Structure: "disk access bus/switch 18; and equivalents thereof."  At the October 31, 2025, hearing, Plaintiff agreed with the Court's preliminary construction.  Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that "Cloud Byte's structure flows directly from the specification, while Dell's structure contradicts the specification and improperly imports extraneous limitations." Dkt. No. 120 at 3; *see id.* at 3–8.

Defendants respond that "Plaintiff's proposal addresses only the second part of the function (simultaneous access), while ignoring the separate structure necessary for the first part of the function (rebuilding data on the replacement disk drive)." Dkt. No. 124 at 2.  Defendants argue that "[t]he specification never describes rebuild module 17 as special-purpose hardware," and "[a]t best, it is a 'black box' that can only be understood as a computer or microprocessor programmed to carry out an algorithm, such that the structure must include the algorithm disclosed in the patent for performing the claimed function." *Id.* (citation omitted).

Plaintiff replies: "Dell concedes three critical points: (1) the disk access bus/switch is not a general-purpose processor or computer programmed to carry out any algorithm; (2) incorporating of step S46 (modify map) from the dependent claims into the construction for independent claim 1 would exclude other ways of rebuilding data; and (3) the specification uses permissive language with respect to the modify map." Dkt. No. 127 at 1 (footnotes omitted).

At the October 31, 2025, hearing, the parties presented oral arguments as to this term.  For example, Defendants argued that algorithmic steps are required because the phrase "rebuild module" does not connote any particular structure.

(b)  Analysis

Title 35 U.S.C. § 112, ¶ 6 (now known as § 112(f)) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover

the corresponding structure, material, or acts described in the specification and equivalents

thereof."

"In exchange for using this form of claiming, the patent specification must disclose with

sufficient particularity the corresponding structure for performing the claimed function and clearly

link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d

1375, 1378 (Fed. Cir. 2014).

The parties agree that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6,

and the parties agree on the claimed function. The parties dispute the corresponding structure.

Figure 1 of the '544 Patent provides context and is reproduced here:



The specification discloses:

In the present invention, a disk access bus/switch for data transfer between said
backup storage device and said replacement disk drive is provided and *the*

*rebuilding of said replacement disk drive from said backup storage is performed through the rebuild module* provided in parallel with a RAID module for performing a normal read/write access to said disk array and said disk access bus/switch, thereby said rebuilding operation of said replacement disk drive being prohibited from influencing a normal access by said RAID module said [*sic*] to said disk array.

\* \* \*

Assume that one of the disks constituting the disk array has failed, the failed disk is replaced with a spare disk or the like, and that data is rebuilt onto the replacement disk in this embodiment mode. Then, it is preferable that transfer of the data from the backup storage 30 to the replacement disk is performed through the rebuild module 17 and the disk access bus/switch 18 so as not to influence a normal access from the host 20 to other disk. That is, the normal access from the host 20 to other disk is performed through the access module 14, RAID module 13, and disk access bus/switch 18. Processing for the rebuilding from the backup storage 30 is performed through the rebuild module 17 provided in parallel with the RAID module 13 and the disk access bus/switch 18. A Port [*sic*] for a cross bus switch or the like constituting the disk access bus/switch 18 may be different between the RAID module 13 and the rebuild module 17. Alternatively, different access buses constituting the disk access bus/switch 18 may be provided for the RAID module 13 and the rebuild module 17, respectively. With this arrangement, influence of the processing for the rebuilding on the normal access is suppressed as much as possible. Details of an operation of a disk array system shown in FIG. 1 will be described in connection with embodiments below.

'544 Patent at 3:33–42 & 5:10–32 (emphasis added).

At first blush, the specification appears to link both the "disk access bus/switch 18" and the "rebuild module 17" to the claimed function. *See id.* The disputed term includes "rebuilding data," and Defendants cite authority that 35 U.S.C. § 112, ¶ 6 requires identifying corresponding structure for all claimed functions. *See Media Rights Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015); *see also* '544 Patent at 6:29–30 ("Rebuilding of the replacement disk is started by the rebuild module . . . .").

In the context of this claim, however, the "rebuild module 17" is not part of the corresponding structure for the "means for rebuilding . . ." Claim 1 of the '544 Patent recites (emphasis added):

- 12 -

> 1. A disk array system comprising:
>   a plurality of disk drives constituting a disk array;
>   a RAID module for performing a normal read/write access to the disk array;
>   a backup storage device;
>   a backup module for reading data from said disk array and writing the read data onto said backup storage device;
>   a replacement disk drive for replacing one of the plurality of disk drives after one of the plurality of disk drives fails;
>   *a rebuild module for performing rebuilding of data on the replacement disk drive based on the data backed up in said backup storage device; and*
>   *means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module.*

Claim 1 thus separately recites "a rebuild module for performing rebuilding of data on the replacement disk drive based on the data backed up in said backup storage device." And, as Plaintiff noted at the October 31, 2025, hearing, Defendants have not sought to apply means-plus-function treatment to the "rebuild module for performing rebuilding . . ." limitation.

The "means for rebuilding . . .," by contrast, is directed not to a structure for rebuilding data but rather to a structure that permits the rebuilding to be performed "*while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module.*" Indeed, this language is part of the agreed-upon claimed function. Dkt. No. 124 at 1. The *Laitram* case cited by Defendants is therefore inapplicable. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("A means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure."). The corresponding structure for *this* function is the "disk access bus/switch 18." *See* '544 Patent at 3:33–42 & 5:10–32 (reproduced above).

Finally, Plaintiff's proposal of referring to specific portions of the specification ("3:33–42, 4:29–52, 5:10–32, and 9:9–19") is unnecessary and potentially confusing because the

corresponding structure is simply the "disk access bus/switch 18" as it is disclosed in the specification. *See Triton*, 753 F.3d at 1378.

The Court therefore hereby construes this disputed term as set forth in the following chart:

| Term | Construction |
|---|---|
| "means for rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module"<br><br>('544 Patent, Claim 1) | Governed by 35 U.S.C. § 112, ¶ 6<br><br>Function:<br>    "rebuilding data on the replacement disk drive from the backup storage device through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module"<br><br>Corresponding Structure:<br>    **"disk access bus/switch 18; and equivalents thereof"** |

**2. "backup storage device"**

| **"backup storage device"**<br>('544 Patent, Claims 1, 13) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction required; plain and ordinary meaning | "device that stores a secondary copy of data from one or more primary RAID devices"<br><br>Alternatively:<br>    "device, apart from the disk array, for storing a backup copy of data on the disk array" |

Dkt. No. 107, Ex. A at 2; Dkt. No. 124 at 6; Dkt. No. 133, App'x A at 2.

Shortly before the start of the October 31, 2025 hearing, the Court provided the parties with the following preliminary construction: "storage, distinct from the disk array, for storing backup

data." At the October 31, 2025, hearing, Defendants had no objection to the Court's preliminary construction. Plaintiff opposed.

(a) The Parties' Positions

Plaintiff argues that "[e]very POSITA understands what a 'backup storage device' means," and "Dell attempts to inject two qualifiers—(1) 'a device that stores *a secondary copy* of data' and (2) '*from one or more primary RAID devices*'—that appear nowhere in the patent." Dkt. No. 120 at 9; *see id.* at 9–12.

Defendants respond that the intrinsic evidence precludes a "backup storage device" from being part of the same disk array that is being backed up. Dkt. No. 124 at 6. Defendants argue that "[t]he specification consistently distinguishes between the disk array (the *primary* storage) and the separate 'backup storage device,' which holds a *secondary* copy of data." *Id.* at 7 (citations omitted). Defendants also cite prosecution history and extrinsic evidence. *Id.* at 8–9.

Plaintiff replies that Defendants' proposal "contradicts the intrinsic record, the claims themselves, and well-established Federal Circuit precedent, and "Dell does not dispute that the specification never mentions the phrases 'primary,' 'copy,' or 'secondary,' yet fails to explain why its constructions do not improperly introduce confusion and ambiguity." Dkt. No. 127 at 2 (citation omitted). As to Defendants' alternative proposal, Plaintiff argues that "Dell again uses words absent from the specification—'apart' and 'backup copy'—that inject ambiguity, and cites no intrinsic evidence supporting this new construction." *Id.* at 4.

At the October 31, 2025, hearing, the parties presented oral arguments as to this term.

(b) Analysis

Claim 1 of the '544 Patent, for example, recites (emphasis added):

1. A disk array system comprising:
    a plurality of disk drives constituting a disk array;

a RAID module for performing a normal read/write access to the disk array;
a *backup storage device*;
a backup module for reading data *from said disk array* and writing the read data *onto said backup storage device*;
a replacement disk drive for replacing one of the plurality of disk drives after one of the plurality of disk drives fails;
a rebuild module for performing rebuilding of data on the replacement disk drive based on the data backed up in said *backup storage device*; and
means for rebuilding data on the replacement disk drive from the *backup storage device* through the rebuild module while simultaneously providing normal read/write access to the disk drives that have not failed through the RAID module.

"Where a claim lists elements separately, the clear implication of the claim language is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010).

Also, the Summary of the Disclosure section of the specification states:

A method according to another aspect of the present invention, comprises:
backing up data in a disk array including a plurality of disk drives onto *a backup storage device which is provided separately from said disk array* . . . .

'544 Patent at 2:62–66 (emphasis added); *see id.* at 2:37–43 ("[R]estoration of data in a replacement disk drive is performed using the backup device. Other disk drives constituting the disk array system are not thereby used for the restoration."). Also, Figure 1 of the '544 Patent illustrates backup storage 30 as being separate from disk array 10.

Nonetheless, "patent coverage is not necessarily limited to inventions that look like the ones in the figures," *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 415 F.3d 1323, 1333 (Fed. Cir. 2007) (citation omitted), and the specification also discloses:

A backup storage 30 is connected to the disk array 10 through a predetermined interface. *The backup storage 30 may be of course configured to be the disk array.*

'544 Patent at 4:47–49 (emphasis added).

Defendants urge that "[i]t is not necessary that each claim read on every embodiment," *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010)"), but Defendants do not

persuasively identify any language in Claim 1 or Claim 13 that would preclude the "backup storage device" from being part of the same structure as the "disk array." For example, the Federal Circuit addressed an analogous situation in *Powell v. Home Depot*, in which the patentee identified a single structure as satisfying both a "cutting box" requirement and a "dust collection structure" requirement. *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) ("the disclosure in the specification cuts against Home Depot's argument that the 'cutting box' and 'dust collection structure' must be separate components for purposes of the infringement analysis"; "even Home Depot's expert agreed that the rear portion of the cutting box on the accused product serves to collect sawdust and woodchips and has at least one port to allow for extraction of the sawdust and wood chips").

Also, Defendants' proposal of referring to one or more primary "RAID" devices relates to a specific feature of particular disclosed embodiments that should not be imported into the claims. *See Phillips*, 415 F.3d at 1323.

Further, Defendants cite prosecution history of the '544 Patent in which the patentee distinguished the "Burton" reference (U.S. Patent No. 7,260,739) as "only disclos[ing] a traditional disk array 150" and as disclosing arrays that "do not provide means for selectively connecting the disk drives to the backup storage device through the rebuild module." Dkt. No. 124, Ex. 1, Mar. 13, 2009, Amendment Under 37 C.F.R. § 1.111 at 9–10. In this prosecution history, however, the patentee referenced claim language reciting "means for selectively connecting the disk drives to the backup storage device through the rebuild module or selectively connecting the disk drives to another device through the RAID module," which does not appear in the claims here at issue. This prosecution history therefore does not persuasively support Defendants' proposed constructions.

Finally, the extrinsic technical dictionary definitions cited by Defendants do not warrant a narrow construction—even where a definition refers to "saving the contents of mass storage on a different medium"—because "different dictionaries may contain somewhat different sets of definitions for the same words," and "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." *Phillips*, 415 F.3d at 1322; *see* Dkt. No. 124, Ex. 3, *Dictionary of Computer Science, Engineering & Technology* 34 (2001) (defining "backup" as "a copy, duplicate, or version kept for the purpose of saving the contents of mass storage on a different medium"); *see also id.*, Ex. 2, *Microsoft Computer Dictionary* 49 (5th ed. 2002) (defining "backup" as: "A duplicate copy of a program, a disk, or data, made either for archiving purposes or for safeguarding valuable files should the active copy be damaged or destroyed.  A backup is an 'insurance' copy.  Some application programs automatically make backup copies of data files, maintaining both the current version and preceding version on disk."); *id.*, Ex. 4, *Dictionary of Information Security* 20 (2006) (defining "backup" as "a duplicate copy of data made for archiving purposes or for protecting against damage or loss").

The Court therefore hereby expressly rejects Defendants' proposed construction, including Defendants' alternative proposal of requiring something "apart" from the disk array, which might imply a physical separation that Defendants have not persuasively justified.  Instead, the above-discussed intrinsic and extrinsic evidence demonstrates that the construction should require merely that the storage is "distinct from the disk array."  Whether backup storage is "distinct" from the "disk array" in an accused instrumentality (which, as the parties discussed at the October 31, 2025 hearing, might be partitioned in various ways) is not a matter for further claim construction on the present record but rather stands as a question of fact regarding infringement.  *See PPG Indus. v.*

*Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

The Court therefore hereby construes "backup storage device" to mean **"storage, distinct from the disk array, for storing backup data."**

### V.  DISPUTED TERMS IN U.S. PATENT NO. 9,482,632

### 3.  "determine that an abnormality is occurring"

| "determine that an abnormality is occurring"<br>('632 Patent, Claims 1, 8, 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary; plain and ordinary meaning | "determine that a deviation from expected or acceptable system behavior is occurring" |

Dkt. No. 107, Ex. A at 4; Dkt. No. 133, App'x A at 3.

Shortly before the start of the October 31, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(a)  The Parties' Positions

Plaintiff argues that "Dell's proposal to replace 'abnormality' with 'deviation from expected or acceptable system behavior' injects ambiguity where none exists and is inconsistent with the specification." Dkt. No. 120 at 12–13.  For example, Plaintiff argues that "Dell's proposal

injects uncertainty and subjectivity as to what is 'expected or acceptable system behavior' and a 'deviation' thereof," and "a computer system may be operating normally even though it is not being sufficiently cooled." *Id.* at 15 (citations omitted).

Defendants respond: "Plaintiff suggests that a determination of an 'abnormality' within the meaning of the '632 patent could include the mere measurement of a temperature and adjustment of fan speed during the normal operation of ICT equipment—where no 'abnormality' of the system has occurred." Dkt. No. 124 at 11. Defendants argue, for example, that "the exceeded threshold is an indicator, not the abnormality itself." *Id.* at 12. Defendants urge that "'abnormality' in the patent is not a raw over-temperature condition, but a deviation from system behavior expected to be acceptable under the given load and intake-air conditions." *Id.* at 13–14.

Plaintiff replies that "Dell does not dispute that the specification consistently discloses abnormalities with respect to the 'cooling function' but does not disclose 'system behavior,' much less what constitutes 'expected' or 'acceptable' behavior, as Dell's construction requires." Dkt. No. 127 at 4 (citation omitted); *see id.* at 4–6.

At the October 31, 2025 hearing, the parties presented oral arguments as to this term.

(b)  Analysis

As a threshold matter, Plaintiff cites *Inter Partes* Review ("IPR") proceedings, in which Defendants gave this term its plain meaning rather than the construction that Defendants are proposing in the present litigation. Dkt. No. 120 at 16 (citing *id.*, Ex. L, July 14, 2025, Petition for *Inter Partes* Review at 10–15, 46–50 & 72–73). Plaintiff does not show that the absence of a proposed construction in IPR proceedings necessarily precludes an accused infringer from proposing a construction in litigation. Rather, in an IPR proceeding, the Patent Trial and Appeal Board ("PTAB") construes terms only where necessary for purposes of the proceeding. *See*

- 20 -

*Unified Patents LLC v. Velos Media, LLC*, IPR2020-00352, Paper 39 at 9–10 (P.T.A.B. June 28, 2021) (finding no construction necessary for a term, and citing "*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (explaining that construction is needed only for terms that are in dispute, and only as necessary to resolve the controversy)").

Claim 1 of the '632 Patent, for example, recites (emphasis added):

1. An abnormality detection device for detecting an abnormality in Information and Communication Technology (ICT) equipment having a cooling fan, the abnormality detection device comprising:
    a hardware processor comprising:
        an estimating unit configured to estimate an upper limit of possible temperatures in a predetermined position of ICT equipment when a quantity of intake air into the ICT equipment is appropriate, based on a result of detection by an operational status detecting unit that detects an operational status of the ICT equipment and a result of detection by an intake-air temperature sensor that detects an intake air temperature of intake air of the ICT equipment, wherein the operational status of the ICT equipment and the intake air temperature of the ICT equipment determines a rotation speed of the cooling fan; and
        a determining unit configured to *determine that an abnormality is occurring* when a result of detection by a temperature sensor that detects a detected equipment temperature in the predetermined position is beyond the upper limit estimated by the estimating unit.

The Background Art section of the specification states:

ICT equipment such as a server may have a cooling fan within a case thereof so as to prevent the internal temperature of the case from excessively rising due to heat generation by an electronic component such as a CPU. Rotation of the cooling fan allows air to be taken in through an inlet opening formed on the case, and the inside of the case is thereby cooled down. A filter is attached to the inlet opening, so that dust does not enter the case. Even if the cooling fan is attached, however, when the filter is clogged or the cooling fan is down, the quantity of intake air decreases, and the inside of the case cannot be cooled down. In a case where the inside of the case cannot be cooled down, the ICT equipment cannot operate normally.

As a technique for solving such a problem, the following technique is known (e.g., see Patent Document 1 [(Japanese Unexamined Patent Application Publication No. JP-A 2006-127283)]. In the technique described in Patent Document 1, firstly, the temperature of intake air and the temperature of a CPU are detected, and an

- 21 -

allowable temperature defined for the intake-air temperature is obtained. Then, the CPU temperature is compared with the allowable temperature and, when the CPU temperature is beyond the allowable temperature, it is examined whether the number of rotations of the cooling fan is a set number of rotations. It is notified to the user that the filter is clogged when the number of rotations of the cooling fan is the set number of rotations, whereas it is notified to the user that the cooling fan is down when the number of rotations of the cooling fan is not the set number of rotations. . . .

In a case where the operational status of the ICT equipment is constant, it is possible to accurately detect an abnormality such as clogging of the filter by the technique described in Patent Document 1. However, in the technique described in Patent Document 1, the CPU temperature is compared with the allowable temperature defined for the intake-air temperature, and it is thereby determined whether an abnormality such as clogging of the filter is occurring. Therefore, in a case where the operational status of the ICT equipment is not constant, it may be impossible to detect an abnormality such as clogging or, by contrast, it may be determined that an abnormality such as clogging is occurring in spite of no abnormality. For example, in the latest ICT equipment, the amount of heat generated by the CPU substantially triples depending on the operational status and this fact is not considered in the technique described in Patent Document 1, so that it is impossible to accurately *detect an abnormality* such as clogging of the filter.

'632 Patent at 1:21–2:2 (emphasis added).  The Summary section of the specification states:

Accordingly, an object of the present invention is to provide an abnormality detection device that solves a problem such that it is impossible to accurately *detect an abnormality* of a cooling function, such as clogging of a filter, in a case where the operational status of ICT equipment is not constant.

*Id.* at 2:6–11 (emphasis added).  The specification further discloses:

The estimating unit 163 has a function of calculating an exhaust-air temperature range estimated as a possible range of exhaust-air temperatures when the intake quantity of air into the case per unit time is appropriate, based on the result of detection by the intake-air temperature sensor 21, the result of detection by the CPU load detecting unit 162, and the content of the fan-rotation-number and temperature-range storing part 165. Moreover, the estimating unit 163 has a function of calculating a CPU temperature range estimated as a possible range of component temperatures of the CPU 13 when the intake quantity of air into the case per unit time is appropriate, based on the result of detection by the intake-air temperature sensor 21, the result of detection by the CPU load detecting unit 162, and the content of the fan-rotation-number and temperature-range storing part 165. To be specific, the estimating unit 163 has a function of searching an exhaust-air temperature range and a CPU temperature range stored in association with the result of detection by the intake-air temperature sensor 21 and the result of detection by

- 22 -

the CPU load detecting unit 162, from the fan-rotation-number and temperature-range storing part 165.

The determining unit 164 has a function of determining whether an *abnormality* of a cooling function such as clogging of the filter is occurring, based on the CPU temperature range and the exhaust-air temperature range calculated by the estimating unit 163, the result of detection by the CPU temperature sensor 22, and the result of detection by the exhaust-air temperature sensor 23.

* * *

Further, according to this exemplary embodiment, even if the load on the CPU 13 is small and the component temperature of the CPU 13 and the exhaust-air temperature are low, it is possible, when an *abnormality* such as clogging of the filter occurs, to securely detect that. This is because, as the result of detection by the CPU load detecting unit 162 indicates a lower load, the upper limits of the CPU temperature range and the exhaust-air temperature range are set to lower temperatures.

'632 Patent at 4:59–5:21 & 7:21–29 (emphasis added); *see id.* at 6:9–15 ("When the component temperature of the CPU 13 is beyond the upper limit of the CPU temperature range (Yes at step S46), the determining unit 164 determines that an abnormality of the cooling function such as clogging of the filter is occurring, and drives the alarming unit"); *see also id.* at 5:65–66 ("the determining unit 164 determines that an abnormality such as clogging of the filter is not occurring"); *id.* at 6:51–56, 7:3–6 & 7:61–64; *id.* at Fig. 4.

The specification thus uses the word "abnormality" broadly, and clogging of a filter is disclosed as merely an example. Defendants do not show any persuasive intrinsic evidence that would warrant introducing the word "deviation" or the concept of "expected or acceptable system behavior."

Indeed, the claim already recites at length a limitation regarding "estimat[ing] an upper limit of possible temperatures." '632 Patent, Cl. 1; *see id.*, Cls. 8 & 9 (similar). A broad understanding of "abnormality" is also consistent with disclosure that relevant ranges of temperature may vary depending on, for example, the "load" on a central processing unit ("CPU").

*See id.* at 7:21–29 ("as the result of detection by the CPU load detecting unit 162 indicates a lower load, the upper limits of the CPU temperature range and the exhaust-air temperature range are set to lower temperatures").

Defendants submit that "in its infringement contentions, Plaintiff suggests that a determination of an 'abnormality' within the meaning of the '632 patent could include the mere measurement of a temperature and adjustment of fan speed during the normal operation of ICT equipment" (Dkt. No. 124 at 11), but this apparent dispute regarding application of the claim language to accused instrumentalities relates to factual questions of infringement, not any legal question for claim construction.  As discussed by the Court during the October 31, 2025, hearing, Defendants' apparent effort to incorporate a purported "gist" of the invention is understandable but is unpersuasive, particularly because the claim language is already sufficiently clear, and Defendants' proposed interpretation of "abnormality" lacks sufficient support in the intrinsic evidence.

The technical dictionary definitions cited by Defendants likewise confirm that "abnormality" has a broad meaning.  *See* Dkt. No. 124, Ex. 5, *McGraw-Hill Dictionary of Scientific and Technical Terms* 3 (defining "abnormality" as "[a]ny deviation from normal characteristics"); *see also id.*, Ex. 6, *Webster's Third New International Dictionary* (1986) (defining "abnormal" as "deviating from the normal," and listing "irregularity" and "deviation" as synonyms for "abnormality").

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It

- 24 -

is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "determine that an abnormality is occurring" to have its **plain meaning**.

## VI.  DISPUTED TERMS IN U.S. PATENT NO. 9,629,265

### 4. "close to the front face"

| **"close to the front face"** ('265 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction required; plain and ordinary meaning | Indefinite |

Dkt. No. 107, Ex. A at 8; Dkt. No. 133, App'x A at 4.

Shortly before the start of the October 31, 2025, hearing, the Court provided the parties with the following preliminary construction: "closer to the front face than to the rear face."  At the October 31, 2025, hearing, Plaintiff was amenable to the Court's preliminary construction. Defendants opposed.

(a)  The Parties' Positions

Plaintiff argues that the intrinsic evidence demonstrates that this term is not indefinite.  Dkt. No. 120 at 17.  For example, Plaintiff argues that "[t]he specification provides extensive functional

guidance for fan positioning" and that "the specification provides a clear, objective framework for understanding how the fans must be positioned relative to the front face in order to perform the described cooling function . . . ." *Id.* at 18.

Defendants respond that "close" is a "relative" or "subjective" term and that "[n]either the claims, the specification, nor the prosecution history provides an objective boundary for the phrase 'close to the front face.'" Dkt. No. 124 at 17; *see id.* at 17–22. Defendants also argue that "[t]here is no accepted definition or understanding of this phrase in the relevant art." *Id.* at 23.

Plaintiff replies that "Dell does not dispute that the term 'close to' is 'ubiquitous in patent claims,' nor does it distinguish Cloud Byte's caselaw." Dkt. No. 127 at 6 (citation omitted). Plaintiff also argues that the prosecution history cited by Defendants is irrelevant, and Plaintiff argues that "the functional guidance in the claim language itself provides the 'objective boundaries' that a POSITA would understand with reasonable certainty, without rendering the term 'superfluous.'" *Id.* at 6–7 (footnote and citation omitted).

At the October 31, 2025 hearing, the parties presented oral arguments as to this term.

(b)  Analysis

As a threshold matter, Plaintiff notes that Defendants applied prior art to the plain meaning of this term in IPR proceedings, but an IPR petition cannot assert indefiniteness. *See* 35 U.S.C. § 311(b); *see also Cuozzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2141–42 (2016); *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 (Fed. Cir. 2020). Defendants' position in the IPR proceedings therefore does not significantly affect the Court's analysis.

Turning to the claim language, Defendants argue that the claim uses "close to" as a term of degree and that therefore the patent "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

Claim 1 of the '265 Patent recites (emphasis added):

1. An electronic device comprising:
    a housing comprising a front face and a rear face which are distanced from each other in a longitudinal direction;
    *a plurality of fans which are arranged inside the housing close to the front face so as to cause cooling air to flow downstream in the longitudinal direction from the front face to the rear face of the housing;*
    a central processing unit (CPU) which is arranged downstream of the plurality of fans in the housing and positioned to allow the cooling air to directly flow therethrough;
    a plurality of memory devices adjacent to the CPU in a width direction, substantially normal to the longitudinal direction, of the housing; and
    a plurality of power source units which are positioned opposite to each other and spaced out from each other in the width direction of the housing,
    wherein the plurality of power source units are each positioned further downstream of the cooling air from the plurality of memory devices such that the cooling air passing through one of the memory devices passes into one of the power source units, and
    wherein the plurality of power source units are each positioned not to be aligned linearly with the CPU in the longitudinal direction of the housing.

The recital of "close to the front face" is a distinct limitation, but the recital of "so as to cause cooling air to flow downstream in the longitudinal direction from the front face to the rear face of the housing" provides significant context. Also, because the recital of "close to the front face" is a distinct limitation, the *Wasica* case cited by Defendants—cited for the proposition that "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous"—is of no moment. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017).

The specification provides additional context:

The fans (i.e. cooling fans) 3 are linearly aligned in the width direction of the main frame 14 and are positioned in the back side of the main frame 14 compared to the switching device 3 and the hard disk drive 9. Each fan 3 is appropriately positioned and designed to cause an air flow in a longitudinal direction from the front side to the rear side in the housing 2.

'265 Patent at 4:23–29; *see id.* at Fig. 1 & 3:56–58 ("a reference sign F denotes a front face of the server 1").  The specification further discloses:

> In the server 1, the fans 3 are driven to blow air in the longitudinal direction from the front side to the rear side of the housing 2. This causes a cooling airflow in the longitudinal direction (see arrows) from the front side to the rear side of the housing 2.
>
> * * *
>
> The fans 42 cause cooling air to propagate from the front face F to the rear face B in the housing 41.  The electronic parts 43 are positioned in the downstream side of cooling air produced by the fans 42. One of the power source units 44 may solely produce adequate electric power to drive the electronic device 40. The power source units 44 are arranged in the downstream side compared to the electronic parts 43.

*Id.* at 5:19–23 & 6:55–62; *see id.* at Figs. 1 & 5; *see also id.* at 5:36–38 ("Cooling air caused by the fans 3 sequentially passes through the CPUs 4 and the memories 5 and then further flows into the downstream side.").

> Also, the Summary of the Invention states:
>
> The present invention aims to create a simple cooling structure for the electronic device. Specifically, the power source units are collectively positioned in the further downstream side of cooling air compared to the electronic parts. Additionally, the power source units are spaced out from each other in the width direction of the housing, perpendicular to the cooling airflow direction of cooling air, in such a way that the power source units do not overlap with the electronic parts in the cooling airflow direction.

*Id.* at 3:4–12.

In this context, the phrase "close to" is reasonably clear, particularly in light of the Federal Circuit having referred to "close to" (among other phrases) as "ubiquitous," noting that this phrase "when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, ha[s] been accepted in patent examination and upheld by the courts."  *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) (quoting *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821 (Fed. Cir.

1988)); *see also Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("[C]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention.").

The indefiniteness finding of the Western District of Texas in *Qcue, Inc. v. Digonex Technologies, Inc.*, as to the term "at or near the expiration time," cited here by Defendants, does not compel otherwise. No. A-12-CA-484-SS, 2013 WL 4784120, at *7 (W.D. Tex. Sept. 5, 2013) (Sparks, J.); *see e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014) ("claims of unrelated patents must be construed separately"). Of particular note, *Qcue* found that the only relevant evidence was extrinsic, namely expert opinions and expert testimony. *Id.*, at *8. In the present case, by contrast, surrounding claim language and the specification provide context for understanding "close to the front face."

The *GE Lighting* and *Halliburton* cases cited by Defendants likewise are not analogous to the term at issue in the present case and do not demonstrate indefiniteness as to "close to the front face." *GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 941 (Fed. Cir. Oct. 27, 2016) ("elongated"); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1252–53 (Fed. Cir. 2008) ("Even if the '832 patent distinguished 'fragile gels' of the invention from those of the prior art, it did not place any limit on the scope of what was invented beyond the prior art.").

Further, Defendants identify no lack of reasonable clarity arising out of the prosecution history. Defendants submit that this disputed term was added by amendment during prosecution and that the prosecution history contains no explanation of the meaning of this term, but Defendants do not demonstrate that an explicit explanation of the amendment was required. Also, Plaintiff persuasively replies that Defendants' arguments regarding the prosecution history as to "Elison" (U.S. Patent Appl. Publ. No. 2015/0073234), "Lin" (U.S. Patent No. 7,839,624), "Dey"

- 29 -

(JP 2006-099773), and "Vinson" (U.S. Patent No. 7,382,613) perhaps pertain to arguments regarding obviousness but do not demonstrate any lack of reasonable certainty as to the disputed term.  The opinions of Defendants' expert in this regard are unpersuasive.  *See* Dkt. No. 120, Ex. F, July 25, 2025, Michalson Decl. ¶¶ 35–42.  The patentee also subsequently added a requirement of "the cooling air passing through one of the memory devices passes into one of the power source units" (Dkt. No. 120, Ex. G, Nov. 30, 2016 Amendment Under 37 C.F.R. § 1.114(c) at 2 & 6–9) but made no suggestion that "close to the front face" has anything other than its ordinary meaning.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument.  As for the proper construction, as noted above the claim provides context by referring to not only a "front face" but also a "rear face" as well as air flowing "downstream" in a "longitudinal direction" with various components arranged downstream of fans.  *See* '265 Patent, Cl. 1 (reproduced above).  At the October 31, 2025, hearing, Defendants opposed the Court's preliminary construction of "closer to the front face than to the rear face," analogizing that although Kansas City is closer to the Atlantic Ocean than to the Pacific Ocean, no one would say that Kansas City is "close to" the Atlantic Ocean.  Under Defendants' analogy, however, the use of "close to" in the claim is perhaps akin to the relative geography of large cities throughout the United States, not a trip to the beach.  That is, the patentee did not rely on the phrase "close to" in an absolute sense but rather used "close to the front face" in a context relative to a rear face.

The Court accordingly hereby construes "close to the front face" to mean **"closer to the front face than to the rear face."**

## VII.  DISPUTED TERMS IN U.S. PATENT NO. 9,651,320

### 5.  "a declination index value calculation unit"

| "a declination index value calculation unit" ('320 Patent, Claims 1, 7, 8) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction required; plain and ordinary meaning | "a unit dedicated to calculating declination index values" |

Dkt. No. 107, Ex. A at 1; Dkt. No. 133, App'x A at 5.

Shortly before the start of the October 31, 2025, hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning. [Note: reject Defendants' proposal of 'dedicated to']."

(a)  The Parties' Positions

Plaintiff argues that Defendants' proposal "simply rephrases the claim term and injects a 'dedicated' requirement which finds no support in the intrinsic evidence and contradicts Dell's own IPR position."  Dkt. No. 120 at 22.

Defendants respond that "Plaintiff's position is inconsistent with the entirety of the intrinsic record and ignores its clear and unmistakable disclaimer of its position during prosecution."  Dkt. No. 124 at 24.  Defendants also submit that "[i]n Dell's construction, the unit being 'dedicated' to calculating declination index values (decreases in temperature) does not mean it cannot also perform other functions; it cannot, however, calculate *increases* in temperature—which it does not do in the specification and Plaintiff confirmed in prosecution."  *Id.* at 26.

Plaintiff replies that "Dell does not dispute that its construction merely re-arranges the claim words while adding the unsupported word 'dedicated.'"  Dkt. No. 127 at 8 (footnote omitted).  Plaintiff urges: "While Dell acknowledges that the declination index value calculation

unit is not 'dedicated' to performing calculations and can perform other functions, Dell attempts to limit the types of calculations it may perform to only 'a decrease in temperature' to the exclusion of increases in temperature, or both.  This newly-minted interpretation of its own construction is unsupported and inconsistent with a POSITA's understanding of the plain claim language."  Dkt. No. 127 at 8 (citation omitted).  Plaintiff argues that Defendants cannot demonstrate any disclaimer or disavowal in the prosecution history or the specification.  *See id.* at 8–9.

At the October 31, 2025, hearing, Defendants presented oral arguments as to this term, and Plaintiff rested on its briefs.

(b)  Analysis

As a threshold matter, Plaintiff cites IPR proceedings in which Defendants gave this term its plain meaning rather than the construction that Defendants are proposing in the present litigation.  Plaintiff does not show that the absence of a proposed construction in IPR proceedings necessarily precludes an accused infringer from proposing a construction in litigation. Rather, in an IPR proceeding, the PTAB construes terms only where necessary for purposes of the proceeding.  *See Unified Patents LLC v. Velos Media, LLC*, IPR2020-00352, Paper 39 at 9–10 (P.T.A.B. June 28, 2021) (finding no construction necessary for a term, and citing "*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (explaining that construction is needed only for terms that are in dispute, and only as necessary to resolve the controversy)").

Claim 1 of the '320 Patent, for example, recites (emphasis added):

1. ICT (information [*sic*] and Communication Technology) equipment having an electronic component, the ICT equipment comprising:
    a cooling fan;
    a first temperature sensor that detects a component temperature of the electronic component included in the ICT equipment;
    a second temperature sensor that detects a temperature of an intake air; and

- 32 -

> a microprocessor including:
> a *declination index value calculation unit* that calculates an index value indicating a degree of declination of the component temperature of the electronic component based on a detection result of the first temperature sensor; and
> a control unit that controls the number of rotations of the cooling fan based on the index value calculated by the *declination index value calculation unit* and the temperature of the intake air by the second temperature sensor.

The specification discloses:

> Referring to FIG. 3, the management section 17 includes a writing means (unit) 171, a control means (unit) 172, a declination index value calculation means (unit) 173, a fan driving section 174, and a storing unit 18 such as a disk unit.
>
> * * *
>
> [T]he declination index value calculation means 173 returns the difference calculated for each of the temperature sensors 22 to 24 to the control means 172, as a declination index value calculated based on the detection result of each of the temperature sensors 22 to 24 (step S72). In the present embodiment, as the detection results of the temperature sensors 22 to 24 are recorded every minute by cyclically using the 60 pieces of record regions provided for each of the temperature sensors 22 to 24, the declination index value calculated as described above is a quantity of declination of the component temperature per unit time (per 1 hour).
>
> * * *
>
> Further, it is also possible to adopt a method of calculating a declination index value as shown in the flowchart of FIG. 9. Referring to FIG. 9, when a declination index value calculation instruction is input from the control means 172, the declination index value calculation means 173 calculates, for each of the temperature sensors 22 to 24, a difference between the highest component temperature and the latest component temperature (step S91). Then, the declination index value calculation means 173 returns the difference calculated for each of the temperature sensors 22 to 24 to the control means 172 as a declination index value calculated based on the detection result of each of the temperature sensors 22 to 24 (step S92).

'320 Patent at 4:4–7, 7:19–29 & 7:55–67; *see id.* at 8:38–55 & 9:1–16.

The specification also discloses that "[t]he declination index value calculation means 103 . . . can be realized by the CPU," so the specification contemplates that a declination index value calculation unit need not be a dedicated, single-purpose piece of hardware. *Id.* at 9:17–27.

- 33 -

Defendants do not dispute this as a general matter, but Defendants maintain that the patentee disclaimed such a unit calculating any *increases* in temperature.

During prosecution, the examiner rejected claims based on the "Takeshi" reference having disclosed a system calculating a "temperature change," which the examiner equated with the "declination index value calculation unit." Dkt. No. 124, Ex. 10, Takeshi at Abstract (p. 36 of 104 of Ex. 10); *id.*, Dec. 10, 2015, Office Action at 3 (p. 53 of 104 of Ex. 10).

The patentee argued that "Takeshi at most calculates the value in which the temperature in a chassis *rises*, not 'an index value indicating a degree of *declination*' as recited in the claims." *Id.*, Mar. 10, 2016 Amendment Under 37 C.F.R. § 1.111 at 7 (p. 63 of 104).

The examiner responded that the patentee's argument regarding Takeshi was not persuasive and stated that "the temperature rise value $E(n)=D(n)-D(n-1)$ of Takeshi accounts for both rises in temperature and declines in temperature." *Id.*, Mar. 29, 2016 Office Action at 5–6 (pp. 72–73 of 104 of Ex. 10).

In response to this rejection, the patentee argued:

<u>No consideration of declination to protect against decrease in temperature</u>

Applicant respectfully submits that Takeshi fails to disclose "a control unit that controls the number of rotations of the cooling fan based on the index value calculated by the declination index value calculation unit and the temperature of the intake air by the temperature sensor."

On pages 2 and 3 of the Office Action, the Examiner alleges that Takeshi anticipates each and every element of claim 1. Specifically, the Examiner looks to paragraphs [0009]-[0024] of Takeshi to allege disclosure of the control unit. Furthermore, on pages 5 and 6 of the Office Action, the Examiner alleges that the temperature rise value of Takeshi accounts for both rises and declines in temperature. Applicant respectfully requests reconsideration.

Applicant respectfully submits that Takeshi aims to protect a substrate and the like from being *damaged by heat* (paragraph [0009]). Takeshi, at most, discloses that a cooling fan is rotated at low speeds only for *saving power* by restricting unnecessary operation (paragraph [0010]). The focus on heat damage is clear as the

"degree of increase of temperature in a housing" is used as data for determination at Step 5 of FIG. 1 in the exemplary embodiment of Takeshi.

On the other hand, the present application has, as a characteristic element, a configuration to calculate "a degree of declination" and control a cooling fan on the basis of the calculated degree of declination. Applicant respectfully submits that this element is not disclosed or implied by Takeshi at all. Moreover, Takeshi does not recognize an issue of the damage or malfunction of an electronic component due to *sudden decrease of temperature*, and hence, it is impossible to easily derive the present claim 1 from Takeshi. Further, the secondary reference of Yutaka merely exhibits a case of stopping a cooling fan, and does not disclose or remedy the deficiency of Takeshi.

<u>No control unit that controls based on the index value and the temperature</u>

Applicant respectfully submits that Takeshi merely aims to protect a substrate from being damaged by *heat* caused by *increase* of temperature in a housing or sudden change of temperature inside a housing. Applicant respectfully submits that Yutaka merely aims to control a fan based on a change rate of temperature in an optical disk.

On the other hand, to solve the problem that damage or malfunction of electronic components is caused if the intake air temperature drops sharply, the present application controls a fan on the basis of "a degree of declination" and "a temperature of an intake air."

Accordingly, Applicant respectfully submits that this point is not disclosed or implied by Takeshi and Yutaka at all. Moreover, Takeshi and Yutaka do not recognize an issue of the damage or malfunction of an electronic component *due to sudden decrease of temperature*, and hence, it is impossible to easily derive a configuration of the present application that controls a fan on the basis of "a degree of declination" and "a temperature of an intake air" from Takeshi and Yutaka.

Accordingly, Applicant respectfully submits that Takeshi fails to anticipate each and every element of claim 1.

*Id.*, June 29, 2016, Amendment Under 37 C.F.R. § 1.116 at 6–7 (pp. 80–81 of 104 of Ex. 10).

The patentee thus distinguished the Takeshi reference as being directed to preventing damage that could be caused by temperature increases rather than by temperature decreases, but Defendants identify no definitive statements that would warrant precluding a "declination index value calculation unit" from being *able to calculate* temperature increases. *See Omega Eng'g Inc.*

- 35 -

*v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive statements* made during prosecution") (emphasis added). To whatever extent Defendants are seeking a finding of "disclaimer by implication" (as discussed at the October 31, 2025, hearing), the Court rejects Defendants' argument in this regard. *See id.*

Finally, even accepting Defendants' assertion that the specification discloses a declination index value only with reference to temperature decreases, not increases, this is a specific feature of particular embodiments that does not justify precluding a "declination index value calculation unit" from being able to calculate temperature increases. *See Phillips*, 415 F.3d at 1323; *see also* '320 Patent at Abstract, 2:19–3:10, 4:4–13, 4:49–54, 5:9–58, 6:55–8:26, 8:59–64 & 9:1–27.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes "a declination index value calculation unit" to have its **plain meaning**.

## VIII.  DISPUTED TERMS IN U.S. PATENT NO. 10,628,273

### 6.  "standby system"

| "standby system" (’273 Patent, Claims 1, 2, 6–14, 16–21) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction required; plain and ordinary meaning. | "a system that can take over service for an active system and remains in an operative state while scaling up or down the number of virtual CPUs" |

Dkt. No. 107, Ex. A at 3; Dkt. No. 133, App'x A at 7–8.

Shortly before the start of the October 31, 2025, hearing, the Court provided the parties with the following preliminary construction: "a system that can take over service for an active system and that is already in an operative state when initiating a scaling up or down of its number of virtual CPUs." At the October 31, 2025, hearing, Plaintiff stated it would be amenable to the Court's preliminary construction if "initiating" were replaced with "performing."

(a)  The Parties' Positions

Plaintiff argues that "'[s]tandby system' is a well-known term of art requiring no construction," and "Dell's proposed construction improperly limits the scope of the term in a manner that is inconsistent with the intrinsic evidence and would improperly import limitations from embodiments in the specification." Dkt. No. 120 at 25; *see id.* at 25–28.

Defendants respond: "The '273 patent identifies delays and failures during the transition from active to standby systems as a key problem in the prior art, and it discloses a solution in which the standby system remains operative as it quickly scales before it becomes the active system.  Plaintiff's contrary position ignores the stated purpose of the invention and would improperly broaden the claims to include approaches expressly disparaged by the patentee." Dkt. No. 124 at 27; *see id.* at 27–30.  Defendants argue, for example, that "the '273 patent expressly disparages cold standby systems . . . ." *Id.* at 27 (citation omitted).

Plaintiff replies that "Dell's proposed construction improperly excludes a standby system that may need to boot (or reboot) before completing the scaling up or down of virtual CPUs." Dkt. No. 127 at 9.  Plaintiff argues that none of the disclosures in the specification cited by Defendants contains any relevant disclaimer or otherwise suggests the narrow interpretation proposed by Defendants. *See id.* at 9–10.

At the October 31, 2025 hearing, the parties presented oral arguments as to this term.

(b)  Analysis

The Technical Field section of the specification states that "[t]he present invention relates to a node system constituting a network, server apparatus, scaling control method, and program" ('273 Patent at 1:17–19), and the Background Art section of the specification states:

> In order to improve reliability, such a system is used in which a plurality of servers are combined to provide a redundant configuration (for instance, reference may be done to Patent Literature 1). For example, a duplex system comprises two servers having the same configuration, and, when one active (active) server (also termed as "operation system" server or "working system" server) fails, the system switches to and operates with a normal server apparatus (also termed as standby server (also termed as "waiting system" server or "reserve system" server)).
>
> (N+1) redundancy system is a system wherein one server apparatus is arranged as a common reserve apparatus (standby server) for N number of server apparatuses (active servers).
>
> In a hot standby system, for instance, data is synchronized between an active server and a standby server such that the standby server can take over service (processing) in an instant, when the active system server fails.
>
> In a so-called cold standby system, a standby server stands by in a stopped state, and when an active server fails, the standby server is started up to switch over the operation and processing. The cold standby system, in which starting up and preparation of the standby server are executed after the active system server fails, has limitation in terms of system downtime and service continuation.
>
> In a system called a warm standby (Warm Standby) system, when an active server operates, a standby server stands with power set on and with OS (Operating System) booted up (with database content being copied asynchronously), and, when the active system server fails, with network switching or the like, a user program such as a business application is invoked, and processing is transferred to the standby server.

*Id.* at 1:23–55.

Figures 2A, 2B, 2C, and 2D of the '273 Patent are reproduced here:

- 38 -



Regarding these Figures, the specification discloses:

<The Operating Principle of Scaling Up>

The operation of scale-up processing according to the present invention will be described with reference to FIGS. 2A, 2B, 2C, and 2D. FIGS. 2A and 2B schematically illustrate virtual CPUs (virtual Central Processing Unit: vCPU) in virtual machines on an active system (ACT system) server 1 and a standby system (SBY system) server 2, respectively, before system switching. In other words, the active system server 1 and the standby system server 2 comprise a virtual machine (VM) virtualized via a hypervisor (HV) not illustrated in the drawings, and the virtual machine comprises at least one virtual CPU (vCPU). FIGS. 2A and 2B illustrate virtual CPUs (vCPUs) allocated to a single virtual machine (VM) on the servers 1 and 2, respectively (virtual CPUs can be allocated up to a maximum number that can be allocated to a virtual machine). One process is assigned to each virtual CPU (vCPU). The number of threads that can be processed in parallel in a

> virtual machine (VM) is proportional to the number of virtual CPUs. In FIGS. 2A and 2B, one process is assigned to one virtual CPU (vCPU), for the sake of simplicity, however, a plurality of processes may be assigned to a single virtual CPU (vCPU). Moreover, a hypervisor, a virtual machine (VM), a guest OS (Operating System), etc., on a server are omitted, only for the sake of simplicity, in FIGS. 2A and 2B. A control apparatus (103 in FIG. 1) that controls system switching is also omitted in FIGS. 2A and 2B.
>
> The standby system (SBY) in FIG. 2B is scaled up (in this case, two more virtual CPUs (vCPUs) are increased (Hotadded), compared to the active system (ACT) executing processing (e.g., session processing) in FIG. 2A. Note that *"Hot add"* is a function to *dynamically* add CPU(s) or memory(s) to a running system. *For example*, in Hotadd, device(s) (vCPUs in this example) can be *added without stopping the virtual machine* (VM), which is caused to recognize the added device(s) (vCPU).
>
> The standby system (SBY) in FIG. 2B is configured as a hot standby system, and hence it is assumed that a process has been already assigned to each virtual CPU (vCPU) and data is synchronized with the active system (ACT) in FIG. 2A. Since the standby system (SBY) in FIG. 2B does not directly affect session processing, etc., a virtual machine (VM) can be started up (restarting a guest OS or a process). Session management function (HTTP (Hyper Text Transport Protocol) session) in SIP (Session Initiation Protocol) or J2EE (Java (registered trademark) 2 Platform, Enterprise Edition) (Servlet) may be used to manage initiation and termination of a session, though not limited thereto.

*Id.* at 6:22–7:2 (emphasis added); *see id.* at 7:3–23.

This disclosure regarding a system "configured as a hot standby system" confirms that the patentee used the term "standby system," in general, as not limited to so-called "hot" standby systems.

Also, the claims do not recite "Hot add" or "Hotadd" and do not explicitly require the standby system to be "hot."  Claim 1 of the '273 Patent, for example, recites (emphasis added):

> 1. A node system comprising:
>    a first computer that executes processing when operating as an active system of a redundant system;
>    a second computer that is able to perform at least one of scale-up and scale-down when operating as a *standby system* of the redundant system; and
>    a controller that issues an instruction to the second computer operating as the *standby system* to perform the scale-up or the scale-down, when the active system needs to be scaled-up or scaled-down,

wherein the second computer operating as the *standby system*, responsive to the instruction, in case of performing the scale-up, increases the number of virtual CPUs (Central Processing Units) included in the second computer and allocates one or more processes to one or more virtual CPUs added, while in case of performing the scale-down, the second computer decreases the number of virtual CPUs included in the second computer and releases allocation of one or more processes allocated to one or more virtual CPUs deleted, and transmits a completion notification to the controller when the scale-up or the scale-down is completed, and

wherein, upon reception of the completion notification of the scale-up or the scale-down from the second computer of the *standby system*, the controller controls to execute system switching of the redundant system to switch the second computer operating as the *standby system* undergoing the scale-up or scale-down to a new active system and to switch the first computer operating as the active system to a new *standby system*.

The claim language, does, however, demonstrate that the "standby system" cannot be "cold" ("stand[ing] by in a stopped state," *id.* at 1:41) during scaling because above-reproduced Claim 1 recites that "the second computer operating as the standby system . . . decreases the number of virtual CPUs included in the second computer and *releases allocation of one or more processes* allocated to one or more virtual CPUs deleted, and transmits a completion notification to the controller when the scale-up or the scale-down is completed."  Defendants persuasively argue that a "cold" standby system would have no running processes and therefore would not comport with this surrounding claim language at the time of scaling.

This understanding comports also with the Summary section of the specification, which refers to the "present invention" as reducing delay when scaling:

> The technology disclosed in Patent Literature 3 [(Japanese Patent Kokai Publication No. JP-P2012-215937A)], however, cannot effectively utilize resources due to the processing of increasing/decreasing VMs and a *delay* required for process allocation and *taking over when the system is scaled up/down* by increasing/decreasing VMs according to the processing load, and also has a problem of a process failure in a scale-down situation (findings by the present inventors).
>
> A *main object* of the *present invention*, invented *in consideration of the problems above*, is to provide a system, apparatus, method, and recording medium storing a

program each capable of *reducing a processing delay* in at least one of scale-up and/or scale-down.

* * *

According to the present invention, a system, apparatus, method, and program capable of *reducing a processing delay at the time of scaling* (scale-up and/or scale-down) can be provided. Still other features and advantages of the present invention will become readily apparent to those skilled in this art from the following detailed description in conjunction with the accompanying drawings wherein only exemplary embodiments of the invention are shown and described, simply by way of illustration of the best mode contemplated of carrying out this invention. As will be realized, the invention is capable of other and different embodiments, and its several details are capable of modifications in various obvious respects, all without departing from the invention. Accordingly, the drawing and description are to be regarded as illustrative in nature, and not as restrictive.

'273 Patent at 2:61–3:5 & 3:47–62 (emphasis added).  Figures 1 and 5 of the '273 Patent illustrate

a "standby system 102" and servers 11 and 21 and are reproduced here:



FIG. 1



FIG. 5

Regarding Figure 1, the specification discloses: "an active system 101 that executes processing, a standby system 102 that can be scaled up and/or scaled down, and a control apparatus (control means) 103 that controls system switching to switch the standby system 102 undergoing the scale up or scale down to a new active system." '273 Patent at 4:36–42.

Regarding Figure 5, the specification discloses a standby system that is "running":

> An application (software) (APL) 27 *running* on a virtual machine (VM) 25 on a server (physical machine) 21 constitutes a standby system (SBY system). . . . In a case where the application 27 of the virtual machine 25 of the standby system server 21 stands by, in a state where the current active system is scaled up, the virtual hardware resources such as virtual CPUs (vCPUs) allocated to the standby system are increased and processes are assigned to the added virtual CPUs (vCPUs) . . . . In a case [of] . . . scale[] down, assignment of the processes to the virtual CPUs (vCPUs) of the virtual machine to be removed is released, and then the virtual hardware resources, such as the virtual CPUs (vCPUs) and so forth, to be removed, are released.

*Id.* at 8:64–9:13 (emphasis added).

Thus, based on the context provided by surrounding claim language, read further in light of disclosed problems of the prior art and above-cited statements in the specification regarding the "present invention," the term "standby system" should be construed to exclude standby systems that are "cold" at the time of scaling.

This finding regarding being operative at the time of scaling does not, however, necessarily preclude a "standby system" from at some times being "cold," but whether a particular system is sufficiently operative—at relevant times required by the claim language—involves implementation-specific details regarding a particular accused instrumentality rather than any further claim construction. Further, as noted at the October 31, 2025, hearing, Plaintiff is amenable to the Court's preliminary construction if "initiating" is replaced with "performing." Based on the above-discussed evidence, the Court adopts this construction.

The Court therefore hereby construes "standby system" to mean **"a system that can take over service for an active system and that is already in an operative state when performing a scaling up or down of its number of virtual CPUs."**

**7. "the standby system, responsive to the instructions, in case of performing the scale-down"**

This term appears in Claim 18 of the '273 Patent. In their October 3, 2025, Joint Claim Construction Chart, the parties submitted an agreement that this term means "the standby system, responsive to the instruction, in case of performing the scale-down." Dkt. No. 133, App'x A at 11. This agreement is set forth in Appendix A to this Claim Construction Order.

## IX. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered

to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 9th day of November, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Agreed Construction |
|---|---|
| "a controller that imposes a processing restriction on the first computer of the active system and then issue an instruction to the standby system" / "a control process that imposes a processing restriction on the active system and then issue an instruction to the standby system"<br><br>('237 Patent, Claims 7, 10) | "a controller that imposes a processing restriction on the first computer of the active system and then issues an instruction to the standby system" / "a control process that imposes a processing restriction on the active system and then issues an instruction to the standby system" |
| "a standby system of the redundant system being able to perform at least scale-down, the scaling control method; comprising:"<br><br>('273 Patent, Claim 17) | "a standby system of the redundant system being able to perform at least scale-down, the scaling control method comprising:" |
| "forwards the packet based on the identifier which uniquely identities the link within the packet forwarding node"<br><br>('249 Patent, Claim 14) | "forwards the packet based on the identifier which uniquely identifies the link within the packet forwarding node" |
| "remove path or link information header"<br><br>('249 Patent, Claims 1, 6, 11, 16, 21) | "remove a path or link information header" |
| "the standby system, responsive to the instructions, in case of performing the scale-down"<br><br>('273 Patent, Claim 18) | "the standby system, responsive to the instruction, in case of performing the scale-down" |

Dkt. No. 107 at 1–2; Dkt. No. 133, App'x A at 6.